609 A.2d 1299

RALPH BENCIVENGA, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. J.J.A.M.M., INC., A CORPORATION OF THE STATE OF NEW JERSEY, D/B/A CLUB 35, DEFENDANT–APPELLANT/CROSS–RESPONDENT, AND JOHN DOE, MELVIN MESZAROS, SAM DOE, BEN DOE, TOM DOE, AND HARRY DOE, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued February 26, 1992—Decided July 14, 1992.

400

Before Judges GAULKIN, MUIR, Jr., and LANDAU.

*Andrew C. Fried* argued the cause for appellant/cross-respondent (*Lorber, Schneider, Nuzzi, Vichness & Bilinkas,* attorneys; *George L. Schneider,* of counsel; *Messrs. Schneider* and *Fried,* on the brief).

*James C. Heimlich* argued the cause for respondent/cross-appellant (*James C. Heimlich* and *Judi Paparozzi,* on the brief).

The opinion of the court was delivered by

MUIR, Jr., J.A.D.

In this personal injury action, the trial court denied the request of J.J.A.M.M., Inc., doing business as Club 35 (Club 35), to instruct the jury to compare the negligence of the club, the negligence of the plaintiff, and the intentional conduct of an unknown defendant, John Doe, for the purposes of apportioning liability under the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1, *et seq.* (Act). The jury found Club 35 liable for the failure to protect the plaintiff, a patron of the club, from an assault by the unknown defendant who was also a patron of the club. It awarded plaintiff $40,000 in compensatory damages. Club 35 appeals asserting, among other things, the trial court erred in denying its request. We conclude the jury should not have been instructed to consider the intentional conduct of the un-named-unknown defendant for the purposes of comparing fault under the Act. We also conclude the record discloses no basis for requiring the jury to consider plaintiff's conduct in its fault allocation. Accordingly, we affirm.

## I.

Club 35 provides music, dancing, and a soda bar for persons 18 to 21 years of age on the second floor of a building that has an adult bar on the first floor. The dancing area is approximately 40 feet by 30 feet with a stage on one side. The club has overhead lighting, which includes a rarely used strobe (flashing) light. The switch to the strobe light is in a room with a locked door. Only club employees have keys to the door.

The club employs personnel to maintain order and "provide safety to the patrons." The personnel are essentially young, muscular men dressed in matching outfits that include jackets identifying them as Club 35 staff. The club operator testified these young men (bouncers) are present to intervene if any problems arise. Two are located on the stage and two on opposite sides of the dance floor. These four bouncers sit on bar stools near the dance floor. They are placed, according to

the operator, so "they're visible to watch if anybody's doing anything." The operator testified all the bouncers are specifically responsible for watching the dance floor to stop "fooling around[,] . . . unordinary type dancing or kicking, waving arms around or whatever, what might be damage [sic] to the customer. . . ." All bouncers have the responsibility to walk back and forth across the dance floor to assure crowd control.

On the evening of January 9, 1988, plaintiff, his brother, and three friends went to Club 35.[1] After being approved for admission by the underage facility manager, defendant Melvin Meszaros, plaintiff, and his companions paid their admission and began dancing. The dance floor was very crowded— "packed elbow to elbow."

After dancing for about twenty minutes, plaintiff and his companions went to the soda bar area to cool off. While there, another male patron walked by a female patron and pinched her. The female, who at the time was talking to one of the bouncers, turned and accused plaintiff. Plaintiff denied he had pinched her. Later, the female again made the accusation, and plaintiff responded by saying he was sorry but he had not done it. The same bouncer then "gave [plaintiff] a dirty look" and suggested plaintiff and his friends leave. Plaintiff did not interpret this to mean leave the club but just to leave the vicinity of the female. Plaintiff and his companions returned to their dancing.

A few minutes later, plaintiff sustained the injury that gave rise to the lawsuit. Plaintiff's companions testified that four young men, two coming from the stage and two others from sides of the dance floor, met next to the stage. None of the four wore the dress of the bouncers. The four then began to cross the dance floor. At the same time the strobe light was

---

[1]The remaining evidence was provided by witnesses for the plaintiff only. Club 35 did not present the testimony of any person who was present on the second floor of Club 35 that night other than the disc jockey, who said he saw nothing unusual.

turned on making it hard to see. The four proceeded across the floor toward plaintiff with the dancers separating as the men pushed their way through. One of plaintiff's companions testified he was pushed aside. The men left an open path in the dance floor crowd. As the four reached the plaintiff, who had his back to them, one said, "Why'd you pinch my girl's ass?" As plaintiff turned, the speaker punched plaintiff in the face. Plaintiff dropped to the floor bleeding profusely from the nose. Although the bouncers on the stage had a clear view of the floor and the four men crossing it, none interceded before or after the assault and none offered any assistance.

With assistance of his companions, plaintiff went to a bathroom on the first floor of the club. The injury made plaintiff almost unrecognizable. Plaintiff's nose was pushed to the right side of his face. Blood covered plaintiff and areas around him.

Shortly after plaintiff arrived in the bathroom, Melvin Meszaros appeared with three bouncers. Plaintiff's companions asked that a rescue squad and the police be called. They also asked for a towel. Instead of offering assistance, Meszaros took plaintiff by the arm and ushered him out of the building. At the same time, two bouncers carried plaintiff's emotionally distraught brother outside.

As plaintiff and his companions stood outside, a bouncer approached. Plaintiff recognized him as the bouncer who was talking to the female when she got pinched. The bouncer said, "I see you guys got your asses kicked." When asked why plaintiff's attacker also had not been removed from the club, the bouncer responded, "[T]he other guy's got juice...."

Plaintiff needed surgery to repair his nose. The operating doctor described the septum as so badly damaged it does not provide adequate stability for the nose. Plaintiff's nose contains a scar and a permanent deviation to the right as a result of the incident.

Plaintiff's complaint sought damages from Club 35 and the unnamed intentional tortfeasor, as well as from unnamed employees of the club. The complaint alleged, alternatively, negligent or intentional conduct on the part of Club 35 and its one named and other unnamed employees. Club 35's answer raised defenses that negligent conduct of others caused plaintiff's injuries but did not assert comparative fault defenses.

## II.

In *Blazovic v. Andrich,* 124 *N.J.* 90, 107, 590 *A.*2d 222 (1991), decided after the trial in this case, the Supreme Court held the Act applies to conduct characterized as intentional. It ruled a jury must be instructed to compare the fault of intentional tortfeasors with that of negligent wrongdoers for the purpose of apportioning liability under the Act. *See N.J.S.A.* 2A:15–5.1. The Court based its ruling on the premise that parties causing an injury should be liable in proportion to their relative fault. *Blazovic v. Andrich, supra,* 124 *N.J.* at 109–10, 590 *A.*2d 222.

*Blazovic* has a fact context somewhat similar to this case. Blazovic sought compensatory damages for injuries he sustained in a parking lot of the defendant restaurant when he was assaulted by five defendants who had been patrons of the restaurant. The evidence suggested comments made by Blazovic precipitated the assault. *Blazovic* held the fault of all parties, Blazovic, the restaurant, and the five assaultive defendants, who settled with Blazovic prior to trial, should be compared for purposes of the Act.

Blazovic rested his claim against the restaurant proprietor, as plaintiff rests his claim against Club 35, on the holding in *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 275, 445 *A.*2d 1141 (1982). *Butler* recognized that the "proprietor of premises to which the public is invited for business purposes of the proprietor owes a duty of reasonable care to those who enter the premises on that invitation to provide a reasonably safe place to do that which is within the scope of the invitation." *Id.*

The duty extends to reasonably foreseeable dangers which include intentionally harmful acts of a third party. *Id.* at 280, 445 *A.*2d 1141. The duty is violated when a proprietor fails to exercise reasonable care to discover intentionally harmful acts of third parties are being done or are likely to be done, or to give warning adequate to enable patrons to avoid the harm, or otherwise to protect them against the harm. *Id.* (quoting Restatement (Second) of Torts § 344, at 223–24 (1965)).

### III.

Club 35 asserts the trial court erred when the court rejected its request to instruct the jury to determine the relative percentages of fault of the plaintiff, the fictitiously named and never identified intentional tortfeasor who assaulted plaintiff, and Club 35. It contends *Blazovic* dictates such a result. We disagree.

### A.

We turn first to the issue of whether the trial court erred in refusing to instruct the jury to compare the fault of the unnamed intentional tortfeasor in assessing liability. *N.J.S.A.* 2A:15–5.1 requires comparison of plaintiff's negligence with the negligence, now fault as the result of *Blazovic,* of the person or persons against whom recovery is sought. *N.J.S.A.* 2A:15–5.2 requires the trier of fact to return a special verdict on "[t]he percentage of negligence of each *party*" with "the total of all percentages of negligence of all the *parties to the suit*" being fixed at 100%. *Id.* (emphasis added).

We conclude the plain and ordinary meaning of the statutory language precludes inclusion of a fictitiously named tortfeasor from the Act's commands for apportioning fault. The plain language of sections 5.1 and 5.2 make the negligence of the person or persons *against whom recovery is sought* and the negligence of each *party* or *parties to the suit* the prerequisites to apportioning fault. A fictitious person is not someone

against whom recovery can be sought because the fictitious person rule, *R.* 4:26–4, and due process prevent entry of judgment against a person designated by a fictitious name.

█  Also, a fictitious person is not a party to a suit. The person plaintiff identifies as a fictitious defendant only becomes a party to the suit when the defendant's true name is substituted in an amended complaint and service is effected. *See Farrell v. Votator Div. of Chemetron Corp.*, 62 *N.J.* 111, 120, 299 *A.*2d 394 (1973); *Stegmeier v. St. Elizabeth Hosp.*, 239 *N.J.Super.* 475, 484–86, 571 *A.*2d 1006 (App.Div.1990). It is at the point of service on the true defendant that a court gains jurisdiction, consonant with due process, and a person becomes a party to a suit. It is at that point when the Act requires the person's conduct be compared for the purposes of apportioning liability and not before.

This result is supported by our holding in *Ramos v. Browning Ferris Ind. of So. Jersey, Inc.*, 194 *N.J.Super.* 96, 476 *A.*2d 304 (App.Div.1984), *rev'd on other grounds,* 103 *N.J.* 177, 510 *A.*2d 1152 (1986). There we stated,

> A truer verdict is more likely to be returned where the fact finder's attention is ultimately fixed on the conduct of the parties who will be affected by the verdict.... With [the] necessary exception [of assessing the negligence of a settling tortfeasor with that of a non-settling tortfeasor for contribution purposes] there is no more reason to have a fact finder assign a percentage of negligence to someone who is not affected by the verdict than to assign a percentage of negligence to acts of God (such as the snow in this case) or a myriad of other causative factors that may have contributed to the happening of an accident. [*Id.* 194 *N.J.Super.* at 106, 476 *A.*2d 304]

By analogy, our reasoning is consistent with the Supreme Court's holding in *Young v. Latta,* 123 *N.J.* 584, 589 *A.*2d 1020 (1991), and our holding in *Tefft v. Tefft,* 192 *N.J.Super.* 561, 471 *A.*2d 790 (App.Div.1983). In *Young* the Supreme Court ruled that the negligence of a settling party should be compared by the trier of fact with that of a non-settling party so the trial court can calculate the latter's credit regardless of whether the non-settling party pursued the credit by way of cross claim for

contribution. *Young v. Latta, supra,* 123 *N.J.* at 595–96, 589 *A.*2d 1020.

*Tefft* recognized the effect the Act had on cross claims for contribution and ruled the trial court, as a matter of law, should dismiss a non-settler's cross claim for contribution as the result of a plaintiff's settlement with another defendant, although the credit survives. *Tefft v. Tefft, supra,* 192 *N.J.Super.* at 570, 471 *A.*2d 790. We concluded once a defendant settles with plaintiff, the only reason for submitting the question of a settling defendant's liability to the fact finder is to provide the basis for calculating the credit to which a non-settler is entitled. *See id.* at 571, 471 *A.*2d 790.

The *Young* and *Tefft* holdings represent the manner in which the Act is applied. Both suggest we look to allocate fault under the Act only between persons who are parties to the litigation whose fault must be assessed for purposes of judgment.

*Blazovic* does not dictate otherwise. *Blazovic* required fault be apportioned among joint or concurrent tortfeasors regardless of the nature of the fault. It did not specifically rule on whether the Act required apportioning fault of an unnamed party. The Court did, however, suggest resolution of the issue in its response to a concern of an Appellate Division dissent. That concern suggested the liability formula enacted in *N.J.S.A.* 2A:15–5.3a could limit a plaintiff's recovery where there are multiply liable tortfeasors if an intentional tortfeasor is deemed to have greater than 40% fault and is unable to pay the judgment. The Court responded, "We reject that [concern] because it ignores the principle that the *parties* causing an injury should be liable in proportion to their relative fault." *Id.* 124 *N.J.* at 110, 590 *A.*2d 222 (emphasis added). The unnamed intentional tortfeasor, John Doe, is not a party as required by the statute. To sanction inclusion of that tortfeasor in the fault allocation-liability format of the Act would engender a result beyond its plain language.

Our review of the decisional law of other jurisdictions offers little persuasive authority on resolution of the issue for our purposes, particularly in light of the language of this State's comparative negligence law. *See* 2 *Matthew Bender's Comparative Negligence Law and Practice* §§ 13.20, 13.90 (1988). Normally, Wisconsin law could be considered a resource for guidance. *See Van Horn v. William Blanchard Co.*, 88 *N.J.* 91, 97, 438 *A.*2d 552 (1981); *but see id.* at 103–04, 438 *A.*2d 552 (Handler, J., dissenting). However, amendments to our law not encompassed in the Wisconsin Comparative Negligence Act weaken the significance the decisional law of that state's highest court may have. Moreover, the issue does not seem settled in that state. *See Reiter v. Dyken*, 95 *Wis.*2d 461, 290 *N.W.*2d 510 (1980) (Wisconsin Supreme Court critical of comparing fault of plaintiff with all defendants where one was dismissed from the case but believed issue better resolved by legislature); *but see Connar v. West Shore Equipment of Milwaukee, Inc.*, 68 *Wis.*2d 42, 227 *N.W.*2d 660 (1975) (a jury in apportioning negligence is required to consider negligence of all parties whether or not they are parties to the action). Besides, this court has rejected the reasoning in *Connar*. *See Ramos v. Browning Ferris Ind. of So. Jersey, Inc.*, *supra*, 194 *N.J.Super.* at 107, 476 *A.*2d 304.

Furthermore, there are strong policy reasons that dictate against including the absent or unnamed tortfeasor from the fact finder's negligence apportionment. The amount of plaintiff's judgment and amount of defendant's liability will vary depending upon whether the absent-unnamed person's negligence is considered by the fact finder. Defendant, however, has a greater incentive to join and name additional potential tortfeasors or to see that they are identified. That greater incentive is the percentage-liability formula. *See Young v. Latta*, *supra*, 123 *N.J.* at 592, 589 *A.*2d 1020. That formula proscribes contribution where fault falls below a certain percentage. *See N.J.S.A.* 2A:15–5.3. Thus, defendant has significant incentive in naming and joining multiple tortfeasors so as

to create the potential for diminishing defendant's percentage of liability to a level that avoids contribution. Given that incentive, it is appropriate to place upon defendant the burden of finding and naming any additional person since it is to defendant's advantage to spread the risk or defeat the claim. *See National Farmers Union Prop. and Cas. Co. v. Frackelton*, 662 *P*.2d 1056, 1060 (Colo.1983).

These policy dictates are particularly poignant here. The evidence recited reflects Club 35 failed to protect plaintiff in the manner the law requires and had the best opportunity to identify the intentional tortfeasor who assaulted plaintiff. Indeed, the evidence suggests the bouncers knew the intentional tortfeasor, yet Club 35 chose to ignore that knowledge and not identify him. Interestingly, Club 35 chose also not to identify its bouncers who were also unnamed defendants, although the bouncers' conduct might have affected the jury's evaluation of Club 35's responsibility. Consequently, and quite apart from our statutory construction, in absence of language demonstrating a contrary legislative purpose, we are satisfied the most equitable result, in light of the circumstances here, is to preclude the unnamed intentional tortfeasor's conduct from the fault comparison for purposes of allocating liability.

### B.

Finally, we turn to the issue of apportioning fault of the plaintiff. The Act requires the trier of fact to translate common liability of joint or concurrent tortfeasors, including plaintiff, into a percentage of causal fault that contributed to plaintiff's injuries. Plaintiff's conduct is compared only when it is wrongful and causally contributed to the injuries sustained. The record evinces nothing from which a reasonable jury could conclude the plaintiff's conduct in any way contributed to the injuries he sustained. *See Dolson v. Anastasia*, 55 *N.J.* 2, 6, 258 *A*.2d 706 (1969); *Wagner v. Deborah Heart & Lung Center*, 247 *N.J.Super.* 72, 81, 588 *A*.2d 860 (App.Div.1991).

## C.

██ We find no merit to plaintiff's cross-appeal charging trial court error in the dismissal of his punitive damage demand. *See R.* 2:11–3(e)(1)(E). We agree the facts here do not entitle plaintiff to recover punitive damages from Club 35. *See Di Giovanni v. Pessel,* 55 *N.J.* 188, 260 *A.*2d 510 (1970).

## IV.

In conclusion we hold the fault of a fictitious person may not be considered when apportioning negligence among parties to the lawsuit. The Act's plain language precludes fault allocation because a fictitious defendant is not a party to the suit and not one against whom recovery is sought. Moreover, we find sound policy reasons applicable to the facts of this case dictate against allocating fault of the unnamed intentional tortfeasor. Also, we find no evidence that required the trial court to instruct the jury to consider the contributory negligence of the plaintiff.

The judgment of the trial court is affirmed.