827 A.2d 1104 (2003)
362 N.J. Super. 256
Gloria BRODSKY, Individually and as Administratrix Ad Prosequendum of the Estate of Bernard Brodsky and Dawn Brodsky-Serafin, Jill Wright and Corey Brodsky, Children, Plaintiffs-Respondents/Cross-Appellants,
v.
GRINNELL HAULERS, INC. and John Bennett, Defendants-Appellants/Cross-Respondents, and
William Horseman, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued May 29, 2003.
Decided July 21, 2003.
*1107 Donald S. McCord, Jr., Morristown, argued the cause for appellants/cross-respondents (O'Donnell, McCord & DeMarzo, attorneys; Mr. McCord, of counsel and on the brief; David N. Heleniak, on the brief).
Bruce H. Nagel, Livingston, argued the cause for respondents/cross-appellants (Nagel, Rice, Dreifuss & Mazie, attorneys; Mr. Nagel, of counsel and on the brief; Adam M. Slater, on the brief).
Before Judges WEFING, LISA and FUENTES. *1105
*1106 The opinion of the court was delivered by LISA, J.A.D.
This appeal requires us to decide whether an ultimate outcome charge should be given in a civil trial where the plaintiffs were not negligent and the jury's task was to allocate causative fault among joint tortfeasors.[1] The trial judge instructed the jury that plaintiffs may recover the full amount of their damages from any defendant found to be sixty percent or more responsible for the total damages, and that a defendant whose share of responsibility is less than sixty percent shall pay only that percentage of the total damages attributable to him.
The jury allocated fault sixty percent against defendant John Bennett and his employer, Grinnell Haulers, Inc. (collectively, defendants) and forty percent *1108 against defendant William Horsman.[2] Horsman was named as a defendant. Because he was discharged in bankruptcy, however, plaintiffs' complaint and defendants' cross-claims against him were dismissed. The jury was nevertheless asked to assess his culpability in the case.
Defendants objected in the trial court to the ultimate outcome charge, and argue on appeal that the trial judge erred in giving it. We agree. We hold that giving the ultimate outcome charge regarding allocation of fault among joint tortfeasors was prejudicial error, requiring reversal and a new trial.
Defendants also argue that the damage verdicts were grossly excessive, requiring a new trial as to damages or, alternatively, a remittitur. We reject this argument and affirm the damage awards. The new trial will be limited to liability issues, including, if both defendants are found liable, allocation by percentage of comparative fault.
Defendants raise several other arguments, which we need not resolve in light of our disposition. They question the wording of some questions on the verdict sheet and the failure to charge "false in one, false in all" and certain motor vehicle violations. These issues will abide the new trial, where, if raised, they will be resolved based upon the evidence presented and the arguments made. Defendants argue that the sixty-forty verdict was so against the weight of the evidence that it constitutes a miscarriage of justice and requires a new trial. This argument is mooted by our determination that error in the jury charge requires a new trial.
Finally, defendants complain of comments by plaintiffs' attorney in his opening statement, suggesting specific percentage allocations the jury should find, and in his closing statement about Horsman's absence, implying, according to defendants, that Horsman was insolvent and uninsured. While these arguments may not provide an independent basis for reversal, we will comment upon them in the course of our opinion.
Plaintiffs cross-appeal, contending the trial court erred in allowing the jury to consider Horsman's comparative negligence. Plaintiffs argue that because their claims against Horsman were discharged in bankruptcy and because Horsman was dismissed from the case, the verdict could not affect Horsman and the jury should not have considered any potential fault on his part. We reject this argument and affirm on the cross-appeal.

I
This case arises from a motor vehicle accident. At approximately 6:20 a.m. on Monday, February 16, 1998, plaintiff Gloria Brodsky and her husband, Bernard Brodsky, were traveling on Route 80 Eastbound in Paterson, a four-lane expanse. Bernard was driving, and Gloria was in the front passenger seat. The Brodskys were sideswiped by a tractor trailer owned by defendant Grinnell Haulers, Inc., and driven by defendant John Bennett, as Bennett attempted to change from the center left to the center right lane. After the collision, the Brodskys' vehicle skidded out of control and came to rest partially in the left lane, and partially on the left shoulder. Shortly after exiting their vehicle, the Brodskys were struck by William Horsman, who was traveling in the left lane. Horsman claims he observed two cars in front of him quickly swerve into the left center lane. He then saw plaintiffs' vehicle in front of him, but he was prevented from changing lanes to avoid it because there were vehicles to his immediate right. *1109 He slammed on his brakes, but hit plaintiffs and their vehicle. This second collision resulted in Bernard's death, and substantial injuries to Gloria. Bennett estimated that "possibly two minutes" transpired between the first and second collisions. Gloria estimated the two collisions were less than five minutes apart.
At trial, defendants' negligence was undisputed, as was plaintiffs' lack of negligence. The only issues tried were defendants' negligence compared to that of Horsman, and plaintiffs' damages. The jury found defendants sixty percent negligent, and Horsman forty percent negligent. The jury awarded total damages $1.64 million.

II
As we have mentioned, Horsman was uninsured and insolvent. He filed for bankruptcy after the accident and was dismissed from this action prior to trial. He was called as a witness, but was not a party. The judge instructed the jury at the beginning of the trial that they should not concern themselves or speculate why Horsman was not a party. Naturally, to maximize the collectability of any damage award, plaintiffs' trial strategy was to place as much blame as possible on defendants. Conversely, to minimize their exposure, defendants sought to shift as much blame as possible to Horsman.
In his opening statement, plaintiffs' attorney said of Horsman: "[H]e's not here. He's not defended. He doesn't have a lawyer." He further stated, "I'm going to suggest to you that Mr. Horsman's responsibility in this case is a fraction and Mr. Horsman's responsibility in this case may be a small fraction, 5 percent, 8 percent, maybe 10 percent." Defense counsel objected to the specific percentage suggestions and moved for a mistrial. The judge denied the mistrial motion but sustained the objection. The judge gave an immediate curative instruction, admonishing the jury to disregard the specific percentage suggestions and not to consider them in determining percentage allocation, which is solely the province of the jury. We agree that the specific percentage suggestions were improper, and we will discuss the issue further in Part IV of this opinion.
This theme was repeated in plaintiffs' attorney's closing: "[Defense counsel] spent twenty minutes in his closing and said, hey, take a look at Mr. Horsman, the fellow that wasn't here with a lawyer, that couldn't defend himself with a lawyer, take a look at him, let's lay the blameon him." This comment crossed the line of propriety by stating that Horsman "couldn't" defend himself with a lawyer. It was obvious to all that Horsman was not a party and not represented in the trial by a lawyer. Thus, any statement to that effect was not prejudicial. But the statement that he "couldn't" defend himself with a lawyer, had the clear capacity to imply that Horsman was uninsured and insolvent. We expect that jurors possess the common knowledge that when someone is involved in a vehicular accident resulting in litigation against them their insurance company furnishes a lawyer to represent them. The jurors would thus be likely to infer that Horsman was uninsured. For the same reason, the jurors would likely glean that Horsman was not a settling defendant. Further, someone who "couldn't" get a lawyer probably could not afford one and was probably not possessed of significant economic means.
The comments were clearly improper, and potentially prejudicial to defendants. It is improper to focus the jury's attention on irrelevant and prejudicial facts, such as a party's financial status or insurance status. Such comments may *1110 constitute reversible error. Brandimarte v. Green, 37 N.J. 557, 562-65, 182 A.2d 562 (1962); Krohn v. New Jersey Full Ins. Underwriters Ass'n, 316 N.J.Super. 477, 481-83, 720 A.2d 640 (App.Div.1998), certif. denied, 158 N.J. 74, 726 A.2d 937 (1999); Pickett v. Bevacqua, 273 N.J.Super. 1, 3-5, 640 A.2d 1173 (App.Div.1994); Amaru v. Stratton, 209 N.J.Super. 1, 16, 506 A.2d 1225 (App.Div.1985). Because of our reversal on other grounds, we need not determine whether this impropriety, of itself, would warrant reversal. However, it played a role in exacerbating the ill effect of the ultimate outcome charge, by reinforcing in the jurors' minds the need to shift sufficient blame to the apparently-solvent defendants if they wanted to assure that plaintiffs would be made whole by their damage award. On retrial, plaintiffs' counsel shall refrain from making such comments.
Defendants claim the trial court erred in issuing an ultimate outcome charge, instructing the jury that a defendant held sixty percent or more responsible would be liable to pay the entire damage award, but, if less than sixty percent, then only for the damages directly attributable to his negligence. As a result of this error, defendants claim they are entitled to a new trial. The charge, given over defendants' objection, stated:
Again, you have to compare their negligence if you find that they're both negligent and both the proximate cause. And I will explain to you the effect of the percentages. The percentage you find will decide the dispute between Bennett and Grinnell and Mr. Horsman regarding the responsibility for the accident. The allocation you make between them will determine how much of the plaintiff's damages each one will pay. One who is found to be 60 percent o[r] more responsible for the total damages is liable to the plaintiff for the total amount of the award. If one is found to be less than 60 percent responsible for the damages is liable only for the amount of damages directly attributable to his negligence or fault; therefore, you will attribute to Mr. Bennett/Grinnell and Horsman the percentage that describes or measures their contributions to the happening of the accident.

[Emphasis added.]
This charge accurately stated the law. N.J.S.A. 2A:15-5.3 now provides:
Except as provided in subsection d. of this section, the party so recovering may recover as follows:
a. The full amount of the damages from any party determined by the trier of fact to be 60% or more responsible for the total damages.
c. Only that percentage of the damages directly attributable to that party's negligence or fault from any party determined by the trier of fact to be less than 60% responsible for the total damages.
Thus, the issue in this appeal is not whether the charge accurately stated the law. The issue is whether the charge should have been given at all, i.e., whether the jury should have been advised of the legal effects of its factual findings.
In Roman v. Mitchell, 82 N.J. 336, 413 A.2d 322 (1980), our Supreme Court held that, in general, a jury should be instructed that the legal effect of holding a plaintiff more than fifty percent negligent would be that the plaintiff recovered nothing. Id. at 345-47, 413 A.2d 322. The Court believed such a charge was necessary because of the structure of New Jersey's modified comparative negligence system, under which counterintuitive results could obtain. Id. at 345, 413 A.2d 322. See also Weiss v. Goldfarb, 154 N.J. 468, *1111 475-76, 713 A.2d 427 (1998) (agreeing with Roman that an ultimate outcome charge is appropriate in order to prevent a jury from operating under a mistaken notion as to how the comparative fault statute operates).
In Roman, the jury fixed the percentage of negligence of the plaintiff at seventy-five percent and that of the defendant at twenty-five percent. Roman, supra, 82 N.J. at 343, 413 A.2d 322. The jurors might reasonably believe the plaintiff would receive twenty-five percent of the damages awarded. Id. at 346, 413 A.2d 322. However, under New Jersey's modified comparative fault scheme, the jury would be mistaken. The plaintiff would receive nothing. N.J.S.A. 2A:15-5.1.
The Court rejected the argument that, if instructed of the legal consequences of the comparative fault allocations, "a jury, motivated by bias or sympathy, might attempt to manipulate the apportionment of negligence to achieve a result that may seem desirable to it." Roman supra, 82 N.J. at 346, 413 A.2d 322. The Court noted that, if a trial court believed the jury's findings were the "product of misunderstanding, bias or prejudice," it could set aside those findings. Id. at 347, 413 A.2d 322.
In the end, the Court left to the discretion of the trial court whether an ultimate outcome charge should be given under the circumstances of any particular case:
We conclude that, ordinarily, a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function. Hereafter, an ultimate outcome instruction should be given to a jury in such a trial. However, in a complex case involving multiple issues and numerous parties, the trial court, in the exercise of sound discretion, could withhold the instruction if it would tend to mislead or confuse the jury.

[Id. at 346-47, 413 A.2d 322.]
Consistent with Roman, the Model Civil Jury Charge Committee has issued model ultimate outcome charges. The current version, Model Jury Charge (Civil), 8.21, "Comparative Negligence: Ultimate Outcome" (Mar.2000) (Model Charge 8.21) recommends that the ultimate outcome charge be given in cases such as this, but the recommendation is with a reservation:
The ultimate outcome charge is required where plaintiff and one defendant may both be causally negligent. It is not clear that the charge is required where plaintiff is not negligent but two defendants have crossclaims. The Committee recommends it.

[Model Charge 8.21, n. 14.]
In conformity with the Committee's opinion, Model Charge 8.21 (emphasis added) provides:
You will attribute to each of them that percentage which you find describes or measures his/her negligent contribution to the happening of the accident. The percentages must add up to 100%.
I will explain to you the effect of these percentages....
The allocation you make among the defendants will determine how much of the plaintiff's damages they will pay.

A defendant found to be 60% or more responsible for the total damages is liable to the plaintiff for the total amount of the award....
Any defendant who is compelled to pay more than his/her percentage share may seek reimbursement from the other joint tortfeasors. Therefore, you will attribute to each defendant the percentage that describes or measures that defendant's *1112 contribution to the happening of the accident.
The charge given in this case is consistent with the model, except it omitted the sentence indicating that defendants could recover from the joint tortfeasor, Horsman. See N.J.S.A. 2A:15-5.3e. In this case, that sentence would have been untrue because Horsman's debt to plaintiffs had been discharged in bankruptcy.
Several cases have discussed whether an ultimate outcome charge is appropriate where, as in the present case, the plaintiff is not alleged to be negligent, and the sole issue presented to the jury is the comparative negligence of others. In Colucci by Colucci v. Thomas Nicol Asphalt Co., 194 N.J.Super. 510, 518, 477 A.2d 403 (App.Div.1984), we held that it did not constitute reversible error for the trial court to have omitted an ultimate outcome charge, where there was no issue of the plaintiff's negligence. The sole issue presented to the jury was the apportionment of negligence between two defendants. Ibid. Under these circumstances, we deemed an ultimate outcome charge "collateral" to the issues presented to the jury, and therefore unnecessary. Ibid.
Similarly, in De Los Santos v. Saddlehill, Inc., 211 N.J.Super. 253, 270, 511 A.2d 721 (App.Div.1986), certif. denied, 107 N.J. 101, 526 A.2d 175 (1987), we held that, in cases where the plaintiff's negligence is not in issue, an ultimate outcome charge is unnecessary. We there concluded that even if such a charge might have been appropriate, the trial court did not abuse its discretion in declining to give such a charge, because the trial was lengthy, and the judge was striving not to confuse the jury. Ibid.
The Law Division reached a contrary result in Dimogerondakis v. Dimogerondakis, 197 N.J.Super. 518, 485 A.2d 338 (Law Div.1984). That case involved the motor vehicle personal injury claim of a passenger against two drivers, one of whom settled with plaintiff before trial. Plaintiff was not claimed to be negligent. The jury was asked to determine by percentage the negligence of each defendant. The judge concluded that the Roman rationale was equally applicable in that situation, warranting an ultimate outcome charge to inform the jury that any damages awarded to the plaintiff would be molded to reflect only that percentage of liability which the jury attributes to the non-settling defendant. Id. at 522-23, 485 A.2d 338.
An analogous issue was raised in Weiss, supra, 154 N.J. at 468, 713 A.2d 427, and Johnson v. Mountainside Hosp., 239 N.J.Super. 312, 571 A.2d 318 (App.Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990). In Weiss, the Court considered whether a jury should receive an ultimate outcome instruction that, at the time of the alleged malpractice, the Charitable Immunity Act, N.J.S.A. 2A:53A-8, limited a hospital's liability to no more than $10,000. Weiss, supra, 154 N.J. at 469, 713 A.2d 427. The Court held that no such charge should be given, stating:

[A]n ultimate outcome charge, based on the Charitable Immunity Act, in a negligence suit against a hospital is not only irrelevant but has the clear potential of being highly prejudicial. We are convinced that the prejudicial effect of such an instruction could be to shift to other defendants some percentage of negligence that the jury thought should rightfully be assessed against the hospital. We find persuasive the hospital's argument that informing a jury about a hospital's limited liability is akin to telling a jury whether a defendant is insured and the amount of coverage and is at least as prejudicial as telling it about insurance coverage. Such a prejudicial *1113 effect would be the antithesis of what Roman ... anticipated.

[Id. at 481, 713 A.2d 427 (emphasis added).]
In Weiss, supra, 154 N.J. at 479, 713 A.2d 427, the Court cited approvingly our decision in Johnson, where we reached the same result, stating:

If the requested instruction was to have any effect upon a jury's verdict, it could only be to persuade the jury to shift to the other defendants some amount for which it had concluded the hospital, and not the other defendants, was justly responsible. By the enactment of N.J.S.A. 2A:53A-8, the legislature determined that, as a matter of social policy, an injured beneficiary of the hospital's works, can shift only a limited share of the consequences of the hospital's negligence to the hospital itself. But there is no reason to believe that a purpose of the statute was to shift any part of those consequences to other parties merely because they happen to be caught up in the same law suit as the hospital. We agree with the trial judge that a charge leading to that result would be unfair and inappropriate. In that respect, we think that the situation presented by this case is different from situations in which an ultimate outcome charge has been held to be required. See Roman v. Mitchell, 82 N.J. 336, 345-347, 413 A.2d 322 (1980); Dimogerondakis v. Dimogerondakis, 197 N.J.Super. 518, 485 A.2d 338 (Law Div.1984).
[Ibid. (quoting Johnson, supra, 239 N.J.Super. at 325-26, 571 A.2d 318 (emphasis added)).]
We conclude that Roman should not be extended to cover the circumstances of this case. See Chavanne by Chavanne v. Clover Fin. Corp., 206 N.J.Super. 72, 80-81, 501 A.2d 1024 (App.Div.1985) (holding that Roman should only be extended under extraordinary circumstances, when necessary to aid the jury in its fact finding function). In Roman, the ultimate outcome charge was deemed appropriate because it was important that the jury understand the potentially counterintuitive nature of New Jersey's modified comparative negligence system, under which the plaintiff would recover no damages if defendants were held less than fifty percent at fault. Weiss, supra, 154 N.J. at 475-76, 713 A.2d 427; Roman, supra, 82 N.J. at 345, 413A.2d 322.
This case raises no similar concern. Under the circumstances here, New Jersey's comparative negligence system works in precisely the manner one would expect. Each defendant is held responsible for the proportion of damages directly attributable to him. N.J.S.A. 2A:15-5.3. A potentially counterintuitive aspect of the statute is that it permits a plaintiff to recover the full amount of the damage award from a defendant held to be at least sixty percent liable. Ibid. No lay person would know that. However, that counterintuitive aspect is corrected by the right of contribution possessed by any party compelled to pay more than his percentage share. N.J.S.A. 2A:15-5.3e.
Thus, the end result of the comparative negligence scheme requires each defendant to be responsible for his own percentage of fault. This result is always subject to financial ability or sufficient insurance coverage to pay. Naturally, juries are not permitted to be informed of these facts. The mechanism under which a plaintiff recovers a damage award is irrelevant to any factual decision the jury is required to make. Whether and how a plaintiff recovers a damage award is none of the jury's concern, and should not be part of its deliberations. Weiss, supra, 154 N.J. at 479-80, 713 A.2d 427 (holding that Roman should not be extended in *1114 cases where it would focus the jury's mind on the plaintiff's collection of damages, rather than comparative fault).
As in Weiss, supra, 154 N.J. at 475-82, 713 A.2d 427, and Johnson, supra, 239 N.J.Super. at 325-27, 571 A.2d 318, the only effect of instructing the jury on this issue would be an inappropriate one. Advised of the effects of a sixty-forty allocation of fault, the jury might well be encouraged to manipulate its allocation of fault, at the expense of its actual apportionment analysis, in order to ensure that plaintiff could recover the full damage award. The jury might be improperly encouraged to allocate sixty percent or more fault to a defendant it believed had the "deeper pockets," and less fault to a defendant perceived to be more financially vulnerable.
Having been advised of the legal effect of a sixty-forty allocation, being aware that defendants were a corporation and its employee represented by counsel, and having been inappropriately reminded by plaintiffs' counsel of Horsman's lack of representation (and, potentially, his weak financial status), the jury allocated sixty percent fault to defendants, and forty percent fault to Horsman. We discern a significant likelihood that the jury was inappropriately encouraged to reach this result, based upon the ultimate outcome charge, and that this substantially prejudiced defendants.
Other jurisdictions have addressed the issue of ultimate outcome charges in the context of assessing comparative liability among multiple defendants. Gehres v. City of Phoenix, 156 Ariz. 484, 753 P.2d 174, 176-77 (App.1987); Kaeo v. Davis, 68 Haw. 447, 719 P.2d 387, 394-96 (1986); Luna v. Shockey Sheet Metal & Welding Co., 113 Idaho 193, 743 P.2d 61, 63-65 (1987); DeCelles v. State Dep't. of Highways, 243 Mont. 422, 795 P.2d 419, 421-22 (1990); Dranzo v. Winterhalter, 395 Pa.Super. 578, 577 A.2d 1349, 1355-56 (1990), appeal denied, 526 Pa. 648, 649, 585 A.2d 468 (1991); Fernanders v. Marks Constr. of South Carolina, Inc., 330 S.C. 470, 499 S.E.2d 509, 510-11 (1998), cert. denied, (Feb. 5, 1999); Lacy v. CSX Transp., Inc., 205 W.Va. 630, 520 S.E.2d 418, 426-32 (1999); Coryell v. Town of Pinedale, 745 P.2d 883, 884-86 (Wyo.1987); Colo.Rev.Stat. Ann. § 13-21-111.5(5) (West 2003).
Arizona, Pennsylvania, South Carolina, and West Virginia courts prohibit ultimate outcome charges under circumstances similar to the present case, essentially for the reasons we have expressed for distinguishing Roman. Specifically: "the collectability or uncollectability of a judgment, the operation of joint and several liability, is simply not relevant to the jury's consideration of whether the defendants were causally liable and in what percent." Dranzo, supra, 577 A.2d at 1356. Accord, Gehres, supra, 753 P.2d at 176-77 (jury not entitled to information regarding which defendants would pay judgment); Fernanders, supra, 499 S.E.2d at 511 ("[b]ecause the [joint and severability] doctrine has no bearing on the jury's ultimate fact-finding role in determining the relative negligence of joint tortfeasors, the manner in which any judgment would be paid was not a proper subject for the jury's consideration"); Lacy, supra, 520 S.E.2d at 426-32 (reversible error for defense counsel to argue potential post-judgment effects of joint and several liability, because to allow such argument would invite inappropriate speculation and conjecture regarding whether and how plaintiff would collect on judgment).
Colorado has prohibited by statute ultimate outcome charges regarding allocation of fault among tortfeasors: *1115 In a jury trial in any civil action in which contributory negligence or comparative fault is an issue for determination by the jury, the trial court shall instruct the jury on the effect of its finding as to the degree or percentage of negligence or fault as between the plaintiff or plaintiffs and the defendant or defendants. However, the jury shall not be informed as to the effect of its finding as to the allocation of fault among two or more defendants.
[Colo.Rev.Stat. Ann. § 13-21-111.5(5) (West 2003) (emphasis added).]
On the other hand, decisions in Hawaii, Idaho, Montana, and Wyoming permit an ultimate outcome charge under the circumstances presented in this case. Kaeo, supra, 719 P.2d at 394-96; Luna, supra, 743 P.2d at 63-65; DeCelles, supra, 795 P.2d at 421-22; Coryell, supra, 745 P.2d at 884-86. These states give somewhat different reasons for approving such a charge.
At the times of decision, these states allowed a defendant found only one percent at fault to be held liable to pay one hundred percent of a plaintiff's damage award, if, for some reason, the joint tortfeasor were unable to pay. Kaeo, supra, 719 P.2d at 394, n. 9; Luna, supra, 743 P.2d at 64; DeCelles, supra, 795 P.2d at 422; Coryell, supra, 745 P.2d at 884. Therefore, the courts in Idaho and Montana believed an ultimate outcome charge was appropriate because their joint and several liability laws posed a trap for the uninformed jury. Luna, supra, 743 P.2d at 65; DeCelles, supra, 795 P.2d at 421. Similarly, the Hawaii court believed the jury should be given information regarding joint and several liability because it might be necessary for the jury to make its findings of fact, and the Wyoming court found Hawaii's reasoning persuasive. Kaeo, supra, 719 P.2d at 395-96; Coryell, supra, 745 P.2d at 885-86.
We find the reasoning of Arizona, Colorado, Pennsylvania, South Carolina, and West Virginia more persuasive than the other states cited. It accords with our analysis of New Jersey law, upon which we base our decision.

III
We next address the contention raised by plaintiffs in their cross-appeal that the trial judge should not have permitted the jury to consider Horsman's comparative negligence because he was bankrupt and had been dismissed from the case. We find no merit in this contention.
A discharge of debt in bankruptcy "operates as an injunction against the commencement or continuation of an action,... to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C.A. § 524(a)(2) (emphasis added). The statute is intended to give debtors a financial "fresh start" and shield them from creditors. In re Jet Florida Sys., Inc., 883 F.2d 970, 972 (11th Cir. 1989).
A bankruptcy discharge does not, however, preclude a debtor from being retained as a nominal defendant to a lawsuit by a creditor, where that lawsuit will not result in any personal liability to the debtor, but instead may result in the liability of some third party, such as the debtor's or creditor's liability insurer. In re Jet Florida Sys., supra, 883 F.2d at 972-76. Accord, First Fid. Bank v. McAteer, 985 F.2d 114, 118 (3d Cir.1993); Green v. Welsh, 956 F.2d 30, 33-35 (2d Cir.1992); In re Greenway, 126 B.R. 253, 254-55 (Bankr.E.D.Tex.1991); In re Mann, 58 B.R. 953, 956-58 (Bankr.W.D.Va.1986). A bankruptcy discharge also does not preclude *1116 a determination, such as the one in this case, of the debtor's portion of liability, where there are multiple tortfeasors, and that determination is needed in order to assess the other tortfeasors' liability. In re Dorner, 125 B.R. 198 (Bankr. N.D.Ohio 1991).
Here, the jury did not assess Horsman's negligence in order to establish Horsman's "personal liability," in violation of 11 U.S.C.A. § 524(a)(2). Rather, the jury assessed Horsman's negligence as a necessary step in determining the extent of defendants' liability, as required under N.J.S.A. 2A:15-5.2a(2) (in all negligence actions in which liability is in dispute, the trier of fact shall determine the percentage of each party's negligence or fault). This issue was properly submitted to the jury.
We recognize that under N.J.S.A. 2A:15-5.2a(2), comparative fault generally should be assessed only against "parties" to the lawsuit. See, e.g., Higgins v. Owens-Corning Fiberglas Corp., 282 N.J.Super. 600, 607-10, 660 A.2d 1252 (App.Div. 1995) (in asbestos litigation, it was reversible error to place National Gypsum on verdict sheet, where National Gypsum had never been a party to the lawsuit); Bencivenga v. J.J.A.M.M., Inc., 258 N.J.Super. 399, 406-10, 609 A.2d 1299 (App.Div.) (trial court did not err in refusing to instruct the jury to compare fault of unnamed/fictitiously named tortfeasor in assessing liability), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992).
It is permissible, however, for a jury to assess liability against individuals who are no longer parties to a lawsuit. For example, a jury may assess the comparative liability of the remaining defendants, and those who settled before trial. Young v. Latta, 123 N.J. 584, 594, 589 A.2d 1020 (1991); Higgins, supra, 282 N.J.Super. at 609, 660 A.2d 1252. See also, Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 194 N.J.Super. 96, 106, 476 A.2d 304 (App.Div.1984) ("Of course, in cases where the judgment cannot be properly molded without assessing the percentage of negligence of a tortfeasor who settled, it is necessary for the fact finder to make such an assessment even though the settling tortfeasor will not be affected by the verdict"), aff'd in part, rev'd in part, 103 N.J. 177, 510 A.2d 1152 (1986).
Similarly, a jury may assess the comparative fault of individuals who were dismissed as defendants due to a plaintiff's failure to comply with the affidavit of merit statute with respect to them. Burt v. W. Jersey Health Sys., 339 N.J.Super. 296, 306-08, 771 A.2d 683 (App.Div.2001). "To hold otherwise would mean that plaintiff's failure to comply with the Affidavit of Merit against the [dismissed] Anesthesiology defendants deprived the [remaining] Hospital defendants, through no fault of their own, of the opportunity to shift some, if not all, of the blame for plaintiff's injuries to the [dismissed] Anesthesiology defendants." Id. at 307, 771 A.2d 683.
Plaintiffs do not address the federal cases limiting the scope of 11 U.S.C.A. § 524(a)(2). Instead, they rely upon cases addressing comparative negligence issues in the workers' compensation context. See, Straley v. United States, 887 F.Supp. 728, 742-43 (D.N.J.1995); Ramos, supra, 194 N.J.Super. 96, 476 A.2d 304. These cases are distinguishable, and do not support plaintiffs' position.
Plaintiffs rely most heavily upon Ramos, supra, 194 N.J.Super. 96, 476 A.2d 304. The plaintiff there was injured in the course of his employment while wheeling a 400-pound drum of solid waste to a large roll-off container in his employer's yard. Id. at 100, 476 A.2d 304. At trial, the jury attributed twenty-five percent of the negligence to the plaintiff, and seventy-five percent *1117 to the defendant, "BFI," a solid waste hauler that leased the container to the plaintiff's employer. Ibid.
On appeal, BFI contended the jury should have been asked to decide the comparative negligence of the plaintiff's employer. Id. at 104-07, 476 A.2d 304. We disagreed, holding that the trial court correctly left the plaintiff's employer off the verdict sheet, because the employer was statutorily immune from liability; the plaintiff's exclusive remedy against his employer, for his employer's negligence, was through the workers' compensation system. Ibid.
That is not the case here. Horsman was not statutorily immune from a negligence suit at the time of the accident. Horsman only became immune after he discharged his debt in bankruptcy. However, a bankruptcy discharge does not preclude the assessment of Horsman's comparative liability, in circumstances such as this, where that assessment would not result in any personal liability to Horsman.
To accept plaintiffs' position would elevate form over substance by blindly adhering to the literal meaning of the term "party" in this context. It would create an anomalous situation in which tortfeasors would be permitted to have their fault allocated and reduced by the percentage of fault attributable to a financially disadvantaged joint tortfeasor who happened to file for bankruptcy after trial, but not with respect to such a joint tortfeasor who happened to file for bankruptcy before trial.

IV
In his opening statement, plaintiffs' attorney suggested to the jury specific percentages of liability it should attribute to Horsman: "I'm going to suggest to you that Mr. Horsman's responsibility in this case is a fraction and Mr. Horsman's responsibility in this case may be a small fraction, 5 percent, 8 percent, maybe 10 percent." Defendants' objection was sustained and the judge gave a curative instruction. The judge denied defendants' mistrial motion.
We agree with the trial judge that the comments were improper. Long ago our Supreme Court proscribed comments by counsel suggesting specific dollar amounts or formulae for computing them regarding unliquidated personal injury damages. Botta v. Brunner, 26 N.J. 82, 138 A.2d 713 (1958). The Court found this practice to constitute "an unwarranted intrusion into the domain of the jury." Id. at 103, 138 A.2d 713. Unliquidated damages are incapable of precise measurement, any statements of counsel stating specific amounts are not based on the evidence, and such comments improperly take the place of evidence and instill in the jurors' minds impressions not founded upon the evidence. Id. at 98, 138 A.2d 713. By its nature, the comment constitutes the opinion of counsel and is speculative and arbitrary. Id. at 98-100, 138 A.2d 713. It tends to get figures and amounts into the jurors' minds, which are likely to remain with them and influence them regardless of any admonition to the contrary. Id. at 98, 138 A.2d 713.
Rule 1:7-1(b) now permits counsel to argue that unliquidated damages should be calculated on a time-unit basis and provides that, if such comments are made, the judge "shall instruct the jury that [the comments] are argument only and do not constitute evidence." See also, Henker v. Preybylowski, 216 N.J.Super. 513, 519-20, 524 A.2d 455 (App.Div.1987) (cautionary instruction under Rule 1:7-1(b) should always be given). Nevertheless, mention of specific dollar amounts remains prohibited. Weiss, supra, 154 N.J. at 481, 713 A.2d 427.
*1118 The rationale of Botta compels the same conclusion with respect to percentages of comparative fault among joint tortfeasors. The subject does not lend itself to precision. The ultimate determination will constitute a qualitative assessment by the jury. We do not suggest that attorneys could not properly argue that a party's contributory fault was "substantial" or "minimal," just as they could so argue with respect to a plaintiff's injury or disability. However, assertion of specific percentages is impermissible.

V
Finally, we address damages. The jury awarded a total of $1.64 million in damages, as follows: (1) $50,000 to the estate on the survivorship action; (2) $350,000 to Gloria for her physical injuries; (3) $750,000 to Gloria for her emotional distress in witnessing the accident; (4) $100,000 to Gloria for her psychiatric injuries as a result of the accident, other than witnessing it; (5) $95,000 to Gloria for lost earnings; and (6) $295,000 to the estate on the wrongful death claim. Defendants contend all the awards are grossly excessive. However, their arguments are directed mainly at the awards of $750,000, $350,000 and $295,000. Defendants request a new trial on damages, or, in the alternative, remittitur. Defendants raised this issue in the trial court in a post-trial motion. The judge denied the motion, finding the damage award did not shock the conscience.
We briefly summarize the evidence relating to damages. At the time of the accident Bernard Brodsky was sixty-nine years old and Gloria Brodsky was sixty-three. They were married for forty-three years and had three grown children. After being struck by Horsman, Gloria was thrown into the air and against the concrete road divider, landing on the roadway on her back. According to her orthopedic surgeon, Dr. David Jeffrey Greifinger, Gloria suffered: (1) open fractures of her right forearm, with attendant nerve damage, requiring surgery; (2) a herniated disk (with some disk degeneration pre-existing the accident), which impinged on nerves in her back, resulting in pain running from her lower back down to her calf and ankle; (3) five fractured ribs; (4) an injury to her right hip, which was either arthritis or avascular necrosis (death of part of the bone, as a result of lost blood supply); (5) a bruised liver; and (6) fluid in her lungs, indicating she suffered chest trauma.
Greifinger opined that, for the rest of her life, Gloria would experience periodic aches and pains from the injuries to her forearm, back, ribs, and hip. The nerves in her forearm, and her liver and lungs had healed completely. These findings were consistent with Gloria's complaints of continued pain and heaviness in her right arm, shooting pain in her lower back and legs, a dull pain in her ribs, and problems with her hip when she walks.
Defendants' medical expert, Dr. Francis DeLuca, an orthopedic surgeon, opined that the damage to Gloria's hip and back was degenerative, and unrelated to the accident. He noted that Gloria had not sought treatment for her back and hip until more than one year after the accident.
With respect to her claim of negligent infliction of emotional distress, Gloria stated that she observed Bernard being struck by Horsman's vehicle. She had a vivid memory of seeing Bernard's feet, in white socks, at the accident scene, and repeatedly yelling for him to wiggle his toes, so she would know he was alive. She learned of his death while she was in the hospital; she regretted being unable to attend his *1119 funeral, to say goodbye, due to her injuries.
In terms of her psychiatric injuries, Gloria stated that, after the accident, she felt lonely, depressed, and guilty for having survived the accident when Bernard had not. She began seeing a psychiatrist, and he prescribed various psychiatric medicines. Gloria believed these medications helped. However, she no longer had the full and happy life she once did. She avoided social situations, saw her children less often, had trouble sleeping, had recurrent dreams of her husband's white socks at the accident scene, and thoughts of the accident intruded on her thoughts during the day. Gloria's daughter, Dawn, noticed changes in Gloria's personality after the accident. Dawn stated that Gloria became fearful, irritable, and bitter; she did not participate in social activities, tired easily, cried often, and found no joy in things that used to bring her pleasure.
Dr. Ronnie Seltzer, plaintiffs' psychiatrist, opined that, as a result of the accident, Gloria suffered from post-traumatic stress disorder, major depressive disorder, and chronic pain syndrome. Seltzer opined that, despite therapy and medications, Gloria continued to experience psychiatric symptoms. He believed these symptoms would continue indefinitely, though they would fluctuate over time.
Defendants' psychiatrist, Dr. David Gallina, opined that immediately after the accident Gloria suffered from major depression. However, by May 10, 2001, when he evaluated her, Gloria suffered from only mild to moderate anxiety and depression, similar to that for which she had been treated prior to the accident. Gallina attributed only approximately fifty percent of Gloria's anxiety and depression to the accident. Gallina also opined that Gloria did not suffer from post-traumatic stress disorder.
Prior to the accident, Gloria had worked for sixteen years as a property manager, and earned $62,000 per year. After the accident, she attempted to return to this job but was laid off because her physical limitations and poor concentration prevented her from doing the job. She then took a part-time job as a cashier at Stern's department store. She earns $9.40 per hour, or approximately $9,000 per year. She began receiving social security when she turned sixty-five. Edmond Provder, a rehabilitation counselor, opined that, given the extent of her physical injuries, her limited education, and her work experience, Gloria's post-injury earning capacity was approximately $9,000 per year.
With respect to the survivorship claim, Dr. John Shane, a pathologist, opined that as a result of the accident, Bernard suffered: open fractures in his right leg; a crushed pelvis; a ruptured bladder; a lacerated liver and spleen; massive hemorrhaging into his abdomen and chest; a fractured right shoulder; a fractured nose; broken teeth; and cardiac arrest. Shane opined that Bernard did not suffer significant brain trauma as a result of the accident. Therefore, his sensation of the pain would not have been dulled. Shane estimated that Bernard suffered pain for seventeen to thirty-four minutes. Shane stated that, as a result of his internal bleeding, Bernard developed cerebral hypoxia, meaning he understood he had to breathe but was unable to do so. He described cerebral hypoxia as a sensation of "impending doom, and ... a very horrible emotional experience to go through." Also supporting the survivorship claim, Bennett stated that, after Bernard was hit by Horsman, Bernard was alive while lying on the roadway; he was breathing, his eyes were open, and his legs and arms were moving slowly.
Defendants' neurological expert, Dr. Ivan Dressner, disagreed with Shane. *1120 Dressner opined that, after being struck by Horsman, Bernard suffered such devastating injuries that he was rendered instantly unconscious and was incapable of feeling any pain.
Gloria relied on Bernard to do household projects and chores, including the family finances and carpentry, which had been Bernard's profession before he retired. She also relied on him for driving, particularly to visit Dawn and their grandchild. Gloria and her three children also relied upon Bernard for advice and support. Dawn, in particular, had a very close relationship with her father, and enjoyed spending time with him. During his frequent weekend visits, he helped in caring for her dogs, and her house.
Damage awards are entitled to respect, and should be remitted only if they are so disproportionate to the injuries suffered as to shock the judicial conscience and clearly convince the court that to sustain the award would be manifestly unjust. R. 4:49-1(a); Baxter v. Fairmont Food Co., 74 N.J. 588, 596-99, 379 A.2d 225 (1977); Adams v. Cooper Hosp., 295 N.J.Super. 5, 13-14, 684 A.2d 506 (App. Div.1996), certif. denied, 148 N.J. 463, 690 A.2d 610 (1997); Goss v. American Cyanamid Co., 278 N.J.Super. 227, 240, 650 A.2d 1001 (App.Div.1994). As to these issues, appellate courts should give due deference to the trial court's feel for the case. Baxter, supra, 74 N.J. at 600-01, 379 A.2d 225.
Where the excessiveness of the damage award is the sole source of the court's determination that a denial of justice has taken place, remittitur may be appropriate, in order to bring the award to within the limits of a proper verdict, and thereby avoid the necessity of a new trial. Fertile v. St. Michael's Med. Center, supra, 169 N.J. 481, 491-92, 779 A.2d 1078 (2001). Remittitur of excessive damage awards is encouraged both at the trial and appellate levels. Caldwell v. Haynes, 136 N.J. 422, 443, 643 A.2d 564 (1994).
We are satisfied the damage awards are supported by the evidence, and neither a new trial, nor remittitur, is warranted. Although the $750,000 emotional distress award, Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980), appears generous, it is justified by evidence of Bernard and Gloria's close relationship, including their forty-three-year marriage, and Gloria's vivid recollection of witnessing Bernard being hit by Horsman and her distress in seeing Bernard lying on the roadway, all the while unable to communicate with him, and not knowing if he was dead or alive. Similarly, the $350,000 award for Gloria's physical injuries is supported by the evidence.
Finally, the $295,000 in wrongful death damages may appear generous, particularly given Bernard's advanced age, and his retired status, with grown children. See, e.g., Gangemi v. Nat'l Health Labs., Inc., 291 N.J.Super. 569, 575-76, 677 A.2d 1163 (App.Div.1996) (wrongful death damages provide compensation for only pecuniary losses suffered by survivors, and not injuries to their feelings, mental suffering, or loss of society and companionship); Alfone v. Sarno, 168 N.J.Super. 315, 321-22, 403 A.2d 9 (App. Div.1979) (same), modified, 87 N.J. 99, 432 A.2d 857 (1981). However, it is justified by the evidence from Gloria and Dawn that Bernard played a large role in the lives of his wife and children. For example: (1) Gloria relied heavily on Bernard for guidance, assistance around the house, assistance with financial matters, and assistance in driving, particularly on their frequent visits from their home in New York to Dawn and their grandchild in New Jersey; (2) the Brodskys' son, Corey, was disabled, and still lived at home; and (3) Bernard provided advice, support, and guidance to his children, and provided Dawn with assistance around the house.
*1121 Like the trial judge, our judicial conscience is not shocked by the award, and we will not interfere with it. The trial error in this case pertains to liability issues only and had no effect on the damage award. Defendants do not contend that the damage award, which they believe is excessive, was influenced by plaintiffs' attorney's improper comments to the jury or by the trial judge giving the ultimate outcome charge. At oral argument, defendants attorney candidly conceded that allocation of fault and determination of damages are separable issues. We agree. The damage award is preserved. Truchan v. Sayreville Bar and Rest., Inc., 323 N.J.Super. 40, 53, 731 A.2d 1218 (App. Div.1999); Showalter v. Barilari, Inc., 312 N.J.Super. 494, 516, 712 A.2d 244 (App. Div.1998); McCalla v. Harnischfeger Corp., 215 N.J.Super. 160, 173, 521 A.2d 851 (App.Div.), certif. denied, 108 N.J. 219, 528 A.2d 36, 37 (1987).
The judgment appealed from is affirmed as to damages and reversed and remanded for a new trial as to liability.
NOTES
[1] By a partial summary judgment, one defendant was determined to be negligent, which was a proximate cause of plaintiffs' injuries.
[2] Incorrectly spelled "Horseman" in the caption.