282 N.J. Super. 600 (1995)
660 A.2d 1252
JOHN C. HIGGINS, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
OWENS-CORNING FIBERGLAS CORPORATION, DEFENDANT-RESPONDENT/CROSS-APPELLANT, AND OWENS-ILLINOIS, INC.; GAF CORPORATION, IN ITSELF AND AS SUCCESSOR TO RUBEROID CORPORATION; RAYMARK INDUSTRIES, INC., SUCCESSOR TO RAYBESTOS MANHATTAN, INC.; KEENE CORPORATION, IN ITSELF AND AS SUCCESSOR TO BALDWIN-EHRET HILL, INC.; CELOTEX CORPORATION, IN ITSELF AND AS SUCCESSOR TO PHILIP CAREY MFG. CO.; EAGLE-PICHER INDUSTRIES, INC.; FIBRE-BOARD CORPORATION; PITTSBURGH CORNING CORP., IN ITSELF AND AS SUCCESSOR TO UNARCO; H.K. PORTER COMPANY; ROCK WOOL MANUFACTURING COMPANY; SOUTHERN TEXTILE CO., FORMERLY SOUTHERN ASBESTOS CO.; GARLOCK, INC.; FLEXITALLIC GASKET CO.; J.W. ROBERTS, LTD., A DIVISION OF TURNER & NEWALL, LTD.; JOHN DOE CORPORATIONS (1-50), DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 12, 1995.
Decided July 13, 1995.
*602 Before VILLANUEVA, WEFING and BRAITHWAITE, JJ.
*603 Joshua M. Spielberg argued the cause for appellant (Tomar, Simonoff, Adourian & O'Brien, attorneys; Mr. Spielberg, of counsel and on the brief).
Frederick E. Blakelock argued the cause for respondent (Tucker, Biegel & Goldstein, attorneys; Mr. Blakelock, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Plaintiff appeals from the judgment which resulted from a molded verdict of $81,000 solely against defendant Owens-Corning Fiberglas Corporation (defendant or Owens-Corning Fiberglas), in which a non party, National Gypsum Company (National Gypsum) was placed on the jury verdict sheet and attributed the largest percentage of liability for plaintiff's asbestosis. Owens-Corning Fiberglas cross appeals from the $25,000 award to plaintiff for future medical monitoring. We reverse and remand for a new trial, rendering the cross appeal moot.
On December 1, 1988, plaintiff filed suit against numerous defendants including Owens-Corning Fiberglas, but not National Gypsum, seeking damages for occupational exposure to asbestos.[1]
During plaintiff's worklife of more than forty-five years, he was employed by many companies. After graduating from high school, he worked as a dye setter for approximately five years. *604 His only exposure to asbestos in that position was one week per year during "shutdown periods" when he worked in a boiler room where there was "insulation all over the place."
Plaintiff next worked from 1942 until 1945 for New York Shipyard which included working as a layout machinist for eight months in what he described as a "pretty new building ... [with] all new installation." Plaintiff later worked for Penn Jersey Shipyard where he was an outside machinist, which involved the installation of machinery. He testified that he was exposed to asbestos while working in the ships' engine rooms, which contained asbestos-ridden insulation.
After World War II, plaintiff worked for RCA as a millwright machinist for thirty-six years. His job involved installation of machinery, installation and removal of air conditioners, boilers, and pumps, and he also operated motor generator sets, fork trucks, backhoes and front-end loaders. Plaintiff testified that, although he did not work directly with asbestos-containing products, he was exposed to asbestos because workers all around him were installing pipes which were wrapped with asbestos-containing pipe coverage, workers would mix the asbestos cement within one or two feet of plaintiff, he frequently breathed asbestos-containing dust and he also worked in areas where workers were removing asbestos products.
Plaintiff's asbestosis became manifest in 1987 when he began experiencing back pain, so he visited his family doctor who referred him to Dr. Donald Auerbach. At the time of trial, plaintiff testified that, physically, he was "not like [he] used to be" in that there were many things he used to do that he could no longer do because of his shortness of breath.
Dr. Auerbach, an expert in internal medicine, pulmonary medicine and asbestos-related diseases, first examined plaintiff in July 1988 and had seen him six or seven times before testifying at trial on May 6, 1993. Plaintiff was diagnosed as having pulmonary asbestosis and asbestos-related pleural disease, which have long *605 latency periods. Asbestosis can lead to a form of cancer known as mesothelioma and to lung cancer.
Dr. Auerbach testified that plaintiff's condition will progress in the future. However, Dr. Auerbach was not permitted to testify about the nature of the progression that, within reasonable medical probability, would probably occur. In addition, the trial judge instructed the jury that they could not consider in making a damages award the future progression, if any, of plaintiff's existing disease.
Dr. Auerbach recommended future medical monitoring, i.e., physical examinations and tests for breathing and oxygen levels, for plaintiff at least once or twice a year. The doctor estimated that this would cost "roughly" between $800 to $900 a year. The judge took judicial notice of plaintiff's life expectancy, which was 9.44 years for the 77-year old plaintiff at the time of trial.
Prior to trial, plaintiff settled with five defendants: Owens-Illinois, Pittsburgh Corning, Flexitallic Gasket, Armstrong World Industries and GAF. Five other companies filed for bankruptcy. At the time of trial, three defendants remained in this case: Owens-Corning Fiberglas, Keene and Garlock.
After all the evidence had been presented to the jury, Owens-Corning Fiberglas's attorney moved for permission to amend its pleadings or answers to allow it to assert a cross claim against National Gypsum and to have National Gypsum placed on the jury verdict sheet. The attorney argued that proof had been presented that plaintiff had been exposed to asbestos-containing products of National Gypsum's and that Owens-Corning Fiberglas would be able to seek contribution against National Gypsum anyway, and because National Gypsum had allegedly settled with plaintiff, it should be included on the jury verdict sheet so that the jury could determine whether it was a substantial contributing factor in causing plaintiff's disease.
The circumstances under which National Gypsum allegedly "settled" are that three of the defendants (Flexitallic, Armstrong *606 and GAF) who did settle with plaintiff are members of an association called the Center for Claims Resolution (CCR), comprised of 20 companies, including National Gypsum, which manufacture or manufactured asbestos-containing products. A condition of settlement with any CCR member is that the plaintiff sign a release releasing claims against all CCR members regardless of whether the individual members are parties to the lawsuit. Thus, plaintiff signed a release which included National Gypsum's name even though it never reached a settlement with National Gypsum.
The judge granted Owens-Corning Fiberglas's motion to place National Gypsum on the jury verdict sheet, reasoning that it was in the interest of justice and efficiency to do so. The judge, pursuant to R. 4:37-2(b), thereafter granted Keene Corporation's motion to dismiss the complaint against it. The following companies were placed on the jury verdict sheet: Garlock, Inc.; Owens-Illinois, Inc.; Owens-Corning Fiberglas; GAF; Armstrong World Industries; Pittsburgh Corning; National Gypsum; and Flexitallic Gasket. All of these companies were defendants in this lawsuit (either settled or non-settled) except National Gypsum.
The jury found that Garlock's and Flexitallic Gasket's products were not a substantial contributing factor in causing plaintiff's disease. The jury assessed percentages of liability among the remaining six companies as follows: defendant Owens-Corning Fiberglas, 15%; Owens-Illinois, Inc., 20%; GAF, 5%; Armstrong World Industries, 25%; Pittsburgh Corning, 5%; and National Gypsum, 30%.
To allocate the 30% attributed to National Gypsum to the defendants found by the jury to be responsible for plaintiff's illness, the judge ultimately molded the verdict as follows: Owens-Corning Fiberglas, 21.4%; Owens-Illinois, Inc., 28.6%; GAF, 7.1%; Armstrong World Industries, 35.8%; Pittsburgh-Corning, 7.1%.
The jury awarded plaintiff a total of $81,000, which was broken down as follows: $50,000 for pain, suffering, and past and future *607 disability due to his asbestosis; $6,000 for past medical expenses; and $25,000 for future medical monitoring.
Plaintiff's motion for a new trial was denied. The judge first rejected plaintiff's arguments regarding the court's refusal to permit the jury to consider the progression of plaintiff's disease, reasoning that to allow a jury to award damages based upon future progression would be "sheer speculation" because Dr. Auerbach stated only that plaintiff's disease would get worse; he never explained how bad it would get. Plaintiff's motion seeking an additur to the jury's verdict for past medical expenses based upon a stipulation before trial was also denied. The judge additionally refused to grant a new trial on the ground that National Gypsum should not have been placed on the jury verdict sheet.
The court denied Owens-Corning Fiberglas's cross motion to reduce the award of $25,000 for future medical surveillance of plaintiff, reasoning that the award was "well within the realm of possibility. The jury could come back and say that he could live longer. Or a jury could say that the prices could go up. Inflation could eat it up."
On appeal, plaintiff argues that (1) the trial judge impermissibly precluded plaintiff from recovering for future progression of his asbestosis despite testimony by plaintiff's medical expert that it was reasonably probable that plaintiff's disease would progress; and (2) the trial judge deprived plaintiff of his right to obtain full recovery for his damages by improperly permitting the jury to apportion a share of liability to a company that was not a party to the lawsuit.
On cross appeal, Owens-Corning Fiberglas argues that the jury's award of $25,000 for medical surveillance was unrelated to the evidence and the award must be set aside or be subject to remittitur.

I.
Plaintiff argues that the trial judge erred in placing National Gypsum on the jury verdict sheet thereby allowing a share of the *608 liability to be apportioned to it. Plaintiff asserts that placing a non party who was not liable in this action on the jury verdict sheet artificially inflated the liability of alleged tortfeasors other than Owens-Corning Fiberglas and thereby caused an inaccurate apportionment of liability. Plaintiff maintains that the effect of this error was to preclude plaintiff from recovering the full amount of his damages. We agree.
No one can say how liability would have been allocated had National Gypsum not been on the jury verdict sheet. Although we do not know what was in the jurors' minds in making their allocation, we do know that they should not have considered the liability of National Gypsum. Defendant's argument that plaintiff is not harmed since the trial court merely did what the jury would have done if National Gypsum were not on the jury verdict sheet is speculation. What is most significant is that National Gypsum was assessed the greatest percentage of responsibility (30%), twice that of Owens-Corning Fiberglas. Since this demonstrates that the jury believed National Gypsum was the major contributor of asbestos-containing products to plaintiff's worksites, it is reasonable to conclude that had National Gypsum not been on the jury verdict sheet, the dynamics of assessing liability would probably have been very different.
What is also significant is the last statement the judge made to the jury before its deliberations:
During the charge I had mentioned some of the defendants that were sued and had settled. I incorrectly stated that National Gypsum had been a named defendant in this case when in fact National Gypsum was not a named defendant in this case.
National Gypsum is just one of the manufacturers of asbestos products [who] settled prior to suit being instituted. (emphasis added).
That statement was clearly erroneous and prejudicial to plaintiff. When the judge told the jury that National Gypsum had "settled" with plaintiff, the jury would in all likelihood have concluded that National Gypsum had acknowledged its liability.
N.J.S.A. 2A:15-5.2(b) requires that the trier of fact shall determine "[t]he extent, in the form of a percentage, of each party's *609 negligence;" and "the total of all percentages of negligence of all the parties to a suit shall be 100%." (emphasis added). In Ramos v. Browning Ferris Industries of South Jersey, Inc., 194 N.J. Super. 96, 107, 476 A.2d 304 (App.Div. 1984), rev'd on other grounds, 103 N.J. 177, 510 A.2d 1152 (1986), we stated that in N.J.S.A. 2A:15-5.2(b), "our Legislature expressed its intent to limit the task of the trier of fact to determining the percentages of negligence of only those persons, necessarily parties, whose percentages must be known in order to mold the judgment."
In Ramos, in discussing whether a trier of fact should assign a percentage of negligence to an immune employer, we posited that "[a] truer verdict is more likely to be returned where the fact finder's attention is ultimately fixed on the conduct of the parties who will be affected by the verdict. Of course, in cases where the judgment cannot be properly molded without assessing the percentage of negligence of a tortfeasor who settled, it is necessary for the fact finder to make such an assessment even though the settling tortfeasor will not be affected by the verdict." Id. at 106, 476 A.2d 304 (citing Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 569, 410 A.2d 674 (1980)).
In Bencivenga v. J.J.A.M.M., Inc., 258 N.J. Super. 399, 406, 609 A.2d 1299 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992), we concluded that the plain and ordinary meaning of the statutory language precludes inclusion of a fictitiously named tortfeasor from the statute's commands for apportioning fault because section 5.2 makes "the negligence of the person or persons against whom recovery is sought and the negligence of each party or parties to the suit the prerequisites to apportioning fault."
It was clearly error for the judge to place National Gypsum on the verdict sheet because it was not a named party nor did it settle with plaintiff as the court told the jury. The ultimate question is whether doing so was harmless error. An error will not cause a reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2.
*610 Since the jury allocated the largest percentage of liability to National Gypsum and the distribution probably would have been different had National Gypsum not been on the jury verdict sheet, this was not the "truest" verdict contemplated in Ramos, supra. Thus, placing National Gypsum on the jury verdict sheet was clearly capable of producing an unjust result.

II.
Plaintiff additionally argues that the trial judge improperly precluded Dr. Auerbach from testifying about the future progression of plaintiff's disease, and that the jury was improperly precluded from awarding damages for the future progression of his disease. Thus, plaintiff argues that he was denied his right to recover compensation for the future consequences of his disease. Because we have already determined that plaintiff is entitled to a new trial, we will address this issue solely for guidance of the trial judge at the new trial.
Dr. Auerbach described the changes in plaintiff's x-rays showing his pleural disease as "very substantial changes ... submassive", which means "a little bit less than a massive change." The doctor also administered four different pulmonary function tests to plaintiff on several occasions, starting in 1987. Dr. Auerbach's most recent examination of plaintiff was in November 1992.
Dr. Auerbach prescribed oxygen for plaintiff in July 1991 because of plaintiff's symptoms (shortness of breath), and to protect his heart from pulmonary hypertension (high blood pressure within the circulation of the chest).
Dr. Auerbach found changes in plaintiff's lungs due to asbestosis. Dr. Auerbach said that lung tests showed that vital capacity and total lung capacity were reduced, which would affect plaintiff's breathing and be correlated to shortness of breath. Dr. Auerbach stated there is no treatment for asbestosis and it will not get better.
*611 Dr. Auerbach was asked whether plaintiff's condition had progressed from the time of diagnosis, and the doctor answered that plaintiff's x-ray had "gotten somewhat worse." He explained that plaintiff's ability to exercise, as measured by a bicycle test, is "much less" than it was in earlier tests. The doctor was then asked whether plaintiff's condition will progress in the future, and after the doctor responded, "Yes," defendant's attorney objected. When the court overruled the objection, the doctor stated that, in his opinion, plaintiff's condition will progress in the future. The doctor was then asked, "As his condition progresses, how will this effect (sic) him physically?" The attorney for Garlock objected, arguing that an answer would be speculative. The judge sustained the objection on that ground.
Plaintiff's attorney next asked whether plaintiff will die[2] from asbestosis or a condition related to asbestosis. Defendant's attorney objected, and the objection was sustained. After hearing arguments from the attorneys at sidebar, the judge again sustained the objection on the ground that an answer would be "far too speculative." The judge reasoned that plaintiff "could die from asbestosis. He can die from a heart attack caused by asbestosis, and he may outlive all of us." We agree with this latter conclusion.
A fair reading of the record as a whole establishes ample evidence to support Dr. Auerbach's opinion that the disease would probably progress and to support submission of the issue of future progression of plaintiff's disease to the jury. The trial judge erred in limiting plaintiff's expert testimony about the nature and extent of probable future progression, and in ultimately precluding the jury from compensating plaintiff for this type of injury.
Future consequences of a present injury are compensable as an element of damages as long as there is "reasonable probability" that such consequences will occur. Coll v. Sherry, 29 N.J. *612 166, 175, 148 A.2d 481 (1959). In choosing this standard, the Supreme Court formulated an accommodation "between the inability to foresee what will eventuate in the future and the principle that a plaintiff may not bring successive actions to recover for the results of a tortious personal injury as they unfold." Id. at 174, 148 A.2d 481.[3] The Court also noted with approval our decision to apply this same standard under an alternative rationale:
a consequence of an injury which is possible, which may possibly ensue, is a risk which the injured person must bear because the law cannot be administered so as to do reasonably efficient justice if conjecture and speculation are to be used as a measure of damages. On the other hand, a consequence which stands on the plane of reasonable probability, although it is not certain to occur, may be considered in evaluation of the damage claim against the defendant.

Budden v. Goldstein, 43 N.J. Super. 340, 347, 128 A.2d 730 (App.Div. 1957).
Recovery is allowed for all injuries that can be proved to a reasonable medical probability of future injury, excluding only those claims that involve no more than an enhanced risk of future injury. Mauro v. Raymark Industries, Inc., 116 N.J. 126, 142-43, 561 A.2d 257 (1989); see also Sullivan v. Combustion Engineering, 248 N.J. Super. 134, 141-42, 590 A.2d 681 (App.Div.), certif. denied, 126 N.J. 341, 598 A.2d 897 (1991). Thus, a plaintiff must be allowed to present the evidence that will tend to show reasonable probability of injury, and the trier of fact must be permitted to decide whether that evidence meets this standard of proof. See Lorenc v. Chemirad Corp., 37 N.J. 56, 76, 179 A.2d 401 (1962) (testimony rendered in terms of a medically probable result precludes a court from holding as a matter of law that a jury question does not exist regarding probability of future onset of disease); cf. Evers v. Dollinger, 95 N.J. 399, 417, 471 A.2d 405 (1984) (plaintiff is entitled to present evidence demonstrating medical probability of recurrence of cancer).
*613 The facts and the Supreme Court's analysis in Coll are directly applicable to this case. Plaintiff, during direct examination of Dr. Auerbach, was precluded from pursuing a line of inquiry regarding the reasonably probable consequences expected to flow from the past harm. By restricting this avenue of inquiry, and by later instructing the jury not to consider it at all in awarding damages, the amount of the verdict was obviously affected because an entire category of damages was foreclosed from recovery. This occurred in spite of the fact that, on cross examination, Dr. Auerbach acknowledged that generally there is no way that one can say whether asbestosis will progress in any individual, but in this particular case, he would make an exception because there were so many factors here that showed that plaintiff was heading in this direction, and plaintiff had already advanced enough that he believed that he could predict that plaintiff's condition would continue to deteriorate.
Dr. Auerbach's opinion that plaintiff's asbestosis will progress in the future was not speculative, but instead was supported by many factors. The first factor is Dr. Auerbach's expertise as a pulmonary physician who is extensively familiar with asbestos-related disease. The second, even more important, factor supporting Dr. Auerbach's opinion was the doctor's objective knowledge as treating physician of plaintiff's disease since 1988. Objective tests demonstrated that plaintiff's asbestosis had progressed significantly in the relatively short period since initial diagnosis in 1987. Specifically, almost all of his breathing tests showed reduced function since the initial tests were done, and because of a breathing impairment, he has needed oxygen since 1991. Plaintiff's diffusing capacity, which measures the lungs' ability to transfer oxygen to the blood, was markedly reduced from 1988, when it was 57%, to 35% in 1992. His condition shown on the x-ray had gotten somewhat worse, and his other breathing tests had become worse. An exercise test showed he had a marked reduction in oxygen tension of the blood.
*614 An M.U.G.A. scan[4] of plaintiff's heart showed that his asbestosis was severe enough that the right side of his heart was not working properly. In addition, the pleural changes on plaintiff's x-rays were "very substantial," or "submassive," which means "a little less than massive."
Thus, based on the documented progression of plaintiff's condition from 1987 to 1992, Dr. Auerbach was able to predict within a reasonable degree of medical probability that plaintiff's condition will progress in the future. This pattern of progression in the past formed the basis for the doctor's opinion.
Although defendant's pulmonary expert, Dr. Alan Pope, characterized certain aspects of plaintiff's disease differently than did Dr. Auerbach, he did concede that plaintiff's condition had progressed since initial diagnosis in 1987 and he also admitted that asbestosis can progress to the point where a person can feel short of breath while just sitting in a chair.
The weight and credibility to be accorded to expert testimony is solely the province of the jury. Biro v. Prudential Insurance Co. of America, 110 N.J. Super. 391, 400-01, 265 A.2d 830 (App.Div.), rev'd on other grounds, 57 N.J. 204, 271 A.2d 1 (1970). It is within the special function of the jury to determine whether an expert's opinion is supported by the facts as they actually exist. Polyard v. Terry, 160 N.J. Super. 497, 511, 390 A.2d 653 (App.Div. 1978), aff'd, 79 N.J. 547, 401 A.2d 532 (1979).

III.
On cross appeal, defendant argues that the jury award of $25,000 for plaintiff's future medical surveillance "is entirely unrelated to the evidence." Defendant also described the amount as "wildly disproportionate" because it was nearly three times the *615 medical costs estimated by Dr. Auerbach. Because we have ordered a new trial, this issue is moot.
We reverse and remand for a new trial. We dismiss the cross appeal as moot.
NOTES
[1] Plaintiff was not deposed until October 7, 1991. At that time, he was shown a series of books that had pictures of asbestos-containing products which enabled him to recall additional manufacturers to whose products he had been exposed. Among the products plaintiff was able to recall was one which was manufactured by National Gypsum. At that time, however, plaintiff says that it was beyond the limitations period to amend his complaint. None of the defendants ever moved to bring National Gypsum into the litigation as a third-party defendant potentially liable for contribution.
[2] Apparently, "die" was erroneously transcribed as "kind."
[3] The Supreme Court has since relaxed the strict requirements of the "single controversy doctrine" with respect to certain later-occurring injuries, in recognition of the practical realities of toxic-tort cases. See Mauro v. Raymark Industries, Inc., 116 N.J. 126, 135-38, 561 A.2d 257 (1989).
[4] This is a nuclear medicine study where a patient is given a shot of a radio isotope in the arm.