35 A.3d 739

DOUGLAS D. DAVIS, PLAINTIFF–RESPONDENT, v. JUSTIN B. BARKASZI, DEFENDANT–RESPONDENT, AND MICHAEL KURILEW, WALTER KURILEW AND NORMAN'S BAR & GRILL, INC., D/B/A KC'S KORNER, DEFENDANTS–APPELLANTS, AND JESSICA L. VERDINI,[1] DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued November 16, 2011—Decided February 9, 2012.

1 Verdini did not participate in the trial and was not mentioned in the parties' briefs. She was named in the complaint as the owner of the car Barkaszi was driving.

Before Judges FUENTES, HARRIS and KOBLITZ.

*Terrence J. Bolan* argued the cause for appellants (*Bolan Jahnsen Dacey,* attorneys; *Mr. Bolan,* of counsel; *Elizabeth A. Wilson,* on the briefs).

*Stephen F. Lombardi* argued the cause for respondent Douglas D. Davis (*Lombardi & Lombardi, P.A.*, attorneys; *Mr. Lombardi*, of counsel; *Randi S. Greenberg*, on the brief).

The opinion of the court was delivered by

KOBLITZ, J.A.D.

This appeal arises from a dram shop action brought by plaintiff Douglas D. Davis against defendants Michael Kurilew, Walter Kurilew and Norman's Bar & Grill, Inc., d/b/a KC's Korner (collectively KC's Korner). Plaintiff alleged that KC's Korner negligently served alcohol to Justin B. "Red" Barkaszi[2] while he was visibly intoxicated in violation of *N.J.S.A.* 2A:22A–5, which resulted in Barkaszi causing an automobile accident while plaintiff was a passenger in his car.

At trial, the jury returned a verdict finding that KC's Korner had negligently served Barkaszi and that this service was a proximate cause of the accident. The jury awarded $420,000 for pain and suffering, as well as $17,000 for lost wages, apportioning thirty percent of the liability to Barkaszi and seventy percent to KC's Korner.

On appeal, KC's Korner alleges that several errors occurred during trial. KC's Korner asserts that the trial judge improperly interpreted the issue of proximate cause and erroneously precluded defense counsel from exploring Barkaszi's past drinking habits as a means to counter the testimony of plaintiff's expert concerning Barkaszi's tolerance to alcohol. The judge further erred in this matter, KC's Korner argues, by instructing the jury that plaintiff's expert's conclusion that Barkaszi was a man of "average tolerance" was not contradicted by the evidence at trial. KC's Korner further maintains that the trial judge improperly instructed the jury that KC's Korner spoliated video surveillance evidence

---

[2] A letter from counsel for KC's Korner indicates that Barkaszi's attorney stated that he chose not to participate in this appeal because Barkaszi reached an agreement with plaintiff.

of the night in question. We agree with KC's Korner that these errors warrant a new trial and reverse.

The trial testimony reveals the following facts. On Tuesday, December 12, 2006, at approximately 10 p.m., plaintiff was injured in a motor vehicle accident shortly after Barkaszi picked him up at his house. Prior to Barkaszi's arrival, plaintiff spoke on the phone with Barkaszi, who was at KC's Korner.

Immediately after plaintiff entered the car, Barkaszi accelerated rapidly. Barkaszi lost control of the vehicle and struck a large tree, approximately 2000 feet from plaintiff's driveway.

Officers William Lenire and Robert Wei of the Piscataway Township Police Department responded to the scene of the accident. Plaintiff and Barkaszi were transported to the Robert Wood Johnson University Medical Center. Two blood samples were taken from Barkaszi. The first sample, taken for medical purposes at approximately 11:45 p.m., revealed a .191% blood alcohol concentration (BAC).[3] The second sample was taken by medical personnel for the police approximately twenty minutes later. This sample revealed a BAC of .189%.

Barkaszi testified that he normally drove fast. He also stated that he began drinking alcohol when he was thirteen years old and that he tended to drink heavily on the weekends, but did not ordinarily drink during the week.

Three witnesses testified at trial that Barkaszi was at KC's Korner just prior to the accident. Dawn Scheuerman was with Barkaszi at KC's Korner that night. She testified that she did not remember the details of the evening well. In her deposition testimony, however, which was taken prior to KC's Korner being named as a party, she stated that she saw Barkaszi consume multiple shots of vodka, including two or three double shots and one or two triple shots. Scheuerman did not recall seeing Bar-

---

[3] A driver with a BAC of .08% or more is guilty of driving while intoxicated. *N.J.S.A.* 39:4–50(a).

kaszi exhibit signs of drunkenness. She further testified that he left KC's Korner sometime between 9:30 p.m. and 10:00 p.m. to pick up plaintiff.

Michael Kurilew,[4] the bartender at KC's Korner, testified that Barkaszi, James Latchford and Dawn Scheuerman were together at KC's Korner that night. He stated that Barkaszi had been there for about an hour and a half and drank Rumplemintz, a blackberry liqueur. He denied serving a triple shot of vodka to Barkaszi on the night of the accident and testified that Barkaszi did not act inappropriately at any point that night. While outside smoking a cigarette, Michael saw Barkaszi drive away quickly from KC's Korner.

Mike Duffell, James Latchford's roommate, was also present at KC's Korner that evening. He testified that he observed Barkaszi drinking Red Bulls with vodka during the course of the night, but that he neither saw Michael Kurilew pour a triple shot of vodka nor witnessed Barkaszi consume one. Duffel also testified that Barkaszi went outside at some point, after which he heard someone rev their engine in the parking lot and perform a "burnout." Duffel stated that Barkaszi then came back inside the bar and was served additional alcoholic beverages. Duffel further testified to hearing another burnout a while later when Barkaszi left KC's Korner.

KC's Korner monitored the bar area with a surveillance system that automatically recorded over previous footage approximately once a week. The system was functioning on the date of the accident. Walter Kurilew, the owner of KC's Korner and Michael's brother, indicated that this system could not record to DVD or VHS and, thus, did not allow for image preservation. Walter testified to learning of the accident shortly after it occurred and before the system recorded over the night's events. Walter further stated that he looked at the surveillance recording

---

[4] As both Michael and Walter Kurilew are named as defendants, we use their first names for convenience and clarity.

from December 12, 2006, but did not take steps to preserve the images or to show them to police. Nor did Michael make efforts to secure the footage.

At sidebar, defense counsel proffered to the trial judge that Walter saw nothing on the surveillance recording to contradict Michael's account of the evening, and so he did not think he would be sued, and therefore did not need to save the footage. The judge precluded Walter from testifying as to what he saw on the surveillance recording and from explaining why he did not attempt to preserve the footage. At the conclusion of trial, the judge gave the jury an adverse inference charge on KC's Korner's failure to preserve this footage.

Plaintiff presented the de bene esse video deposition testimony of Dr. John Brick, an expert in alcohol pharmacology and forensic toxicology. Dr. Brick concluded that Barkaszi consumed eighteen ounces of vodka on the night of the accident. He explained that most people exhibit visible signs of intoxication at a BAC of .15% and that, based on his review of the relevant factors, including Barkaszi's BAC, his weight, and the accident report, Barkaszi would likely have reached this level of intoxication between 9:25 p.m. and 9:50 p.m. on the night of the accident.

Dr. Brick further stated that, while tolerance can increase among alcoholics, there was nothing in the record to indicate that Barkaszi was an alcoholic or had chronic alcohol problems; he therefore concluded that Barkaszi was a person of average tolerance. Dr. Brick opined that Barkaszi would be characterized as a "binge drinker." His determination was based in part on medical records that included statements that Barkaszi was known to "drink heavily, but not on a regular basis, drinking at most one to two days per week, seven drinks at that time." Dr. Brick did admit, however, that a "binge drinker" could "fall into the alcoholic category or the problem drinker category" if "certain clinical criteria were met." Dr. Brick explained that his review of the evidence prompted him to conclude that Barkaszi's consumption of

alcohol that night was a significant contributing factor to the motor vehicle accident.

I

■ We agree with KC's Korner's assertion that the trial judge erred in declining to allow defense counsel the opportunity to explore the issue of Barkaszi's tolerance to alcohol and in instructing the jury that Barkaszi had an average tolerance.

At trial, defense counsel sought to examine both Barkaszi and plaintiff as to Barkaszi's past drinking habits in an attempt to establish that he drank alcohol frequently enough to have developed a higher tolerance, and would therefore be less likely to exhibit visible signs of intoxication than a person of average tolerance at the same BAC. If Barkaszi's tolerance to alcohol would render him less likely to exhibit visible signs of drunkenness, then Michael Kurilew, the bartender, might not have known Barkaszi was intoxicated and would not have been negligent in serving him additional drinks. *See Mazzacano v. Estate of Kinnerman*, 197 *N.J.* 307, 324, 962 *A.2d* 1103 (2009) ("a licensed alcoholic beverage server is negligent 'only when the server served a visibly intoxicated person' or serves a minor.") (quoting *N.J.S.A.* 2A:22A–5(b)).

In refusing to allow defense counsel to pursue this line of questioning with either Barkaszi or plaintiff, the trial judge opined that KC's Korner would need to present expert testimony to contest Dr. Brick's determination that Barkaszi was a man of average tolerance. KC's Korner contends that no expert was necessary, as defense counsel was simply trying to undermine Dr. Brick's classification of Barkaszi as a "man of average tolerance" by showing that the facts underlying his expert opinion did not reflect the reality of the situation. Accordingly, defense counsel should have been permitted to probe Barkaszi's drinking history so the jury could assess whether the evidence supported Dr. Brick's conclusion.

■ The reliability of an expert opinion "necessarily depends upon the competency and the integrity of the one who thus bears witness and the facts and circumstances upon which the opinion is made to rest[.]" *Ravitz v. Chirelstein*, 135 *N.J.L.* 5, 7, 49 *A.*2d 485 (1946).

> While evidence in a given case may stand uncontradicted by other evidence, it may yet be controverted in the sense that its trustworthiness is challenged and the subject-matter is not admitted; and, ordinarily, the weight of the evidence, even though uncontradicted, is determinable by the triers of the facts and not by the court as a matter of law. . . .
>
> [*Id.* at 6–7, 49 *A.*2d 485.]

■ A trial court's determinations concerning the admission of evidence "are not to be disturbed in the absence of a showing of a clear abuse of discretion." *State v. Simon Family Enters., L.L.C.*, 367 *N.J.Super.* 242, 257, 842 *A.*2d 315 (App.Div.2004) (citing *Green v. New Jersey Mfrs. Ins. Co.*, 160 *N.J.* 480, 492, 734 *A.*2d 1147 (1999)). We conclude that the trial judge abused his discretion in precluding defense counsel from eliciting testimony as to Barkaszi's drinking habits. *See Hisenaj v. Kuehner*, 194 *N.J.* 6, 12, 942 *A.*2d 769 (2008).

KC's Korner properly looks to *Panko v. Grimes*, 40 *N.J.Super.* 588, 594, 123 *A.*2d 799 (App.Div.1956), to support its claim that the issue of Barkaszi's tolerance was a question of fact for the jury to decide. *See also Higgins v. Owens–Corning Fiberglas Corp.*, 282 *N.J.Super.* 600, 614, 660 *A.*2d 1252 (App.Div.1995) (noting that "[i]t is within the special function of the jury to determine whether an expert's opinion is supported by the facts as they actually exist") (citation omitted). In *Panko*, we ordered a new trial because the issue of whether plaintiff had "some degree of permanent injury" was improperly decided by the court. *Panko, supra*, 40 *N.J.Super.* at 594, 123 *A.*2d 799. We explained that, because the expert's conclusion as to permanency was at least partially based on the "subjective symptoms related to him by Mrs. Panko," the jury could choose to discredit Mrs. Panko's testimony as to those symptoms, and thus "might accord correspondingly less

weight to Dr. Schulman's conclusion and find that the condition was not permanent." *Id.* at 595–96, 123 *A*.2d 799 (App.Div.1956).

Plaintiff contends that the jury could not make the determination as to alcohol tolerance without the testimony of a medical expert. However, in *Panko,* we rejected a similar argument on the grounds that expert opinion is not necessary to contradict prior expert testimony because "there could be conflicting inferences from the medical data adduced. Slight conflict in the evidence will generally make the issue of permanency of physical injuries one for the jury." *Id.* at 597, 123 *A*.2d 799.

Similar to the expert in *Panko,* Dr. Brick was relying on subjective information about Barkaszi to categorize him as a person of average tolerance. He stated that

Mr. Barkaszi does not have, from the medical evidence, any of the—at least the minimum pre-requisites that he was in that special category of drinkers. *Drinking one or two times a week, even seven drinks* is not going to produce the type of physiological tolerance to the behavioral effects of alcohol that some of these highly intoxicated and exceptionally tolerant individuals achieved.

[emphasis added.]

Dr. Brick's knowledge of Barkaszi's drinking habits was derived in part from medical records that included statements from people familiar with his drinking history. These statements were not medical conclusions but factual observations subject to rebuttal.

█ Thus, the foundation for these facts could properly be called into question by examining individuals, such as Barkaszi and plaintiff, who might testify as to contrary observations. If KC's Korner established that Barkaszi drank more often than "one or two times a week," then the premise underlying Dr. Brick's conclusion would be undermined. While KC's Korner did not produce medical evidence to contradict Dr. Brick's opinion, it was still within the jury's province to accept or reject that assertion because the jurors are the ultimate finders of the facts underpinning the expert's opinion. *Higgins, supra,* 282 *N.J.Super.* at 614, 660 *A*.2d 1252; *Chirelstein, supra,* 135 *N.J.L.* at 6, 49 *A*.2d 485. "[R]easonable [people could] disagree on the proofs as to the existence of the determinative physical condition," *Panko,*

*supra,* 40 *N.J.Super.* at 598, 123 *A.*2d 799, namely, the level of Barkaszi's tolerance as dictated by his drinking habits.

■ Plaintiff asserts that even if Barkaszi's drinking history is relevant, questioning plaintiff as to his knowledge concerning this subject would have been overly prejudicial to plaintiff under *N.J.R.E.* 403. Specifically, plaintiff contends that such questioning would cause a jury to speculate that plaintiff knew Barkaszi had been drinking on the night of the accident, as well as to question plaintiff's own drinking habits. However, any prejudice to plaintiff flowing from his knowledge of Barkaszi's drinking habits could have been ameliorated with a limiting instruction to the jury.

■ The trial judge improperly removed this issue from the jury by stating there was "no evidence in this case that Mr. Barkaszi had anything other than average tolerance for alcohol." The judge's refusal to allow KC's Korner to develop evidence concerning Barkaszi's alcohol tolerance, coupled with this charge, erroneously deprived the jury of its opportunity to consider the issue, thereby potentially affecting the jurors' decision as to liability, and thus constituted reversible error. *See Victor v. State,* 401 *N.J.Super.* 596, 617, 952 *A.*2d 493 (App.Div.2008), *aff'd, in part, modified in part,* 203 *N.J.* 383, 4 *A.*3d 126 (2010) (If the jury charge is incorrect, it "constitutes reversible error only if the jury could have come to a different result had it been correctly instructed.").

II

The trial judge also erred in his interpretation of proximate cause. Specifically, the judge precluded KC's Korner from arguing at trial that, in determining whether KC's Korner's service of alcohol to Barkaszi was a proximate cause of the accident, the jury should look only to the effect of the drinks served negligently, that is after Barkaszi was visibly intoxicated, rather than assess whether Barkaszi's overall intoxication was a proximate cause. The trial

judge refused to include such an instruction in the jury charge and in the jury interrogatories.

KC's Korner's proposed Jury Verdict Form stated the question of proximate cause as: "Was the negligence of defendant KC's Korner a proximate cause of the accident?" The question actually submitted to the jury, however, asked: "Was the service of alcohol by defendant, KC's Korner, by and through its employees, to defendant Justin B. Barkaszi ("Red"), a proximate cause of the accident?"

The jury charge on proximate cause read as follows:

If you find that KC's did serve alcoholic beverages to Red when he was visibly intoxicated, you then must determine whether or not that conduct was a proximate cause of the collision. By proximate cause, we mean a cause which naturally and probably led to the collision and the resulting injuries. Sometimes, event—an event results from two or more causes. Nevertheless, if a person's negligence is a substantial factor in causing a collision, that person is held liable to a person so injured. *Therefore, you must also determine whether the service of alcoholic beverages to Red was a substantial factor in bringing about the collision.* [emphasis added.]

The trial judge explained his decision, outside the presence of the jury, by stating that "the negligence is the serving of the one drink. The causal relationship is the entire group of drinks...."

KC's Korner argues that this charge was erroneous because the jury could have found that the final drink was the only one served negligently and was not absorbed by Barkaszi in time for that alcohol to impact his driving at the time of the accident. Such an assertion is based in part on testimony from Dr. Brick that alcohol is not absorbed into the bloodstream until thirty to ninety minutes from the time of consumption. KC's Korner thus claims that the court's version of proximate cause prejudiced KC's Korner and resulted in the arbitrary and unjust result that, if the jury found that Barkaszi had become visibly intoxicated at 9:50 p.m. and KC's Korner had served him his last drink at 9:45 p.m., "the bar would not be negligent and 100% of the liability for the 10:06 [p.m.] accident would devolve upon Mr. Barkaszi;" if, however, KC's Korner had served Barkaszi his last drink at 9:51 p.m., KC's Korner would be "responsible for the entire degree of intoxication,

despite the fact that under this scenario Barkaszi would have been just as intoxicated at the time of the accident even without the last service."

KC's Korner looks to the language of *N.J.S.A.* 2A:22A–5(a)(2), which imposes liability on a licensed beverage server if "[t]he injury or damage was proximately caused by the negligent service of alcoholic beverages," to support its claim that the trial judge's refusal to allow this proximate cause argument constituted reversible error.

Plaintiff claims that KC's Korner's construction of proximate cause would place an "impossible burden of proof" upon plaintiff and would frustrate the intent of *N.J.S.A.* 2A:22A–2. Plaintiff further argues that KC's Korner's proximate cause interpretation would be appropriate only in cases where negligence was alleged against multiple beverage establishments. Plaintiff therefore maintains that KC's Korner's service of alcohol to Barkaszi, if done after he showed visible signs of intoxication, should still be considered a "substantial factor in bringing about" the accident, regardless of whether the negligently served drink had been absorbed by Barkaszi at the time of the crash.

*N.J.S.A.* 2A:22A–5, enacted in 1987, provides that:

a. A person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server only if:

(1) The server is deemed negligent pursuant to subsection b. of this section; and

(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

(3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.

b. A licensed alcoholic beverage server shall be deemed to have been negligent only when the server served a visibly intoxicated person, or served a minor, under circumstances where the server knew, or reasonably should have known, that the person served was a minor.

The model jury charge derived from this statute is as follows:

Thus, plaintiff is entitled to recover from the *[name of licensed alcoholic beverage server]*, if plaintiff proves by the preponderance (greater weight) of evidence the following elements:

1. That defendant served alcoholic beverages to *[name]*;

2. That when the alcoholic beverage was served the person was visibly intoxicated (or, was known or reasonably should have been known to be a minor);

3. That such service of alcoholic beverages was a proximate cause of the *[event]* and injury complained of; and

4. That the injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.

[Model Jury Charge, (Civil) 5.71 "Tavern Keepers Serving Minors and Intoxicated Persons".]

■ The jury charge read by the trial judge in this case, as well as the jury verdict sheets, were based on this model jury charge. In reviewing a charge to the jury, an appellate court will not reverse the trial court if it is convinced that the charge as a whole was accurate. *See State v. Thompson,* 59 *N.J.* 396, 411, 283 *A.*2d 513 (1971).

■ "[T]o be a proximate cause ... conduct need only be a cause which sets off a foreseeable sequence of consequences, unbroken by any superseding cause, and which is a substantial factor in producing the particular injury." *Showalter v. Barilari, Inc.,* 312 *N.J.Super.* 494, 503, 712 *A.*2d 244 (App.Div.1998).

■ In discussing principles of comparative fault in dram shop cases, New Jersey courts have employed a presumption that "[i]f the tavern serves alcohol to a visibly-intoxicated patron, a court will ordinarily presume the patron's lack of capacity to evaluate the ensuing risks." In such circumstances, the jury should consider this presumption when apportioning fault among joint tortfeasors in a dram shop case. *Lee v. Kiku Rest.,* 127 *N.J.* 170, 184, 603 *A.*2d 503 (1992).

KC's Korner notes that the language of *N.J.S.A.* 2A:22A-5(a)(2) speaks solely to the "negligent service of alcoholic beverages." Only the drinks served after "the server served a visibly intoxicated person," *N.J.S.A.* 2A:22A-5(b), are to be considered in a proximate cause analysis. The trial judge's interpretation of the law of proximate cause under *N.J.S.A.* 2A:22A-5, as he instructed the jury in his charge and placed in the verdict sheets, was

incorrect because it allowed the jury to conclude that if KC's Korner served Barkaszi one drink after he was visibly intoxicated, then it is liable for the result of his drunk driving, even if that one drink did not contribute to his intoxication at the time of the accident because it was not yet absorbed into Barkaszi's bloodstream.

In circumstances such as these, where a defendant reasonably raises the defense that no alcohol served after visible intoxication entered the driver's bloodstream prior to the accident, the trial judge should amplify the proximate cause paragraph of the model jury charge. In these limited circumstances, the judge should instruct the jury that the negligently served alcohol must have had sufficient time to negatively effect the driver's ability to drive. The facts underlying the time of consumption in relation to the time of the accident will necessarily limit a defendant's access to this amplified charge.

## III

The trial judge gave the jury an adverse inference charge regarding Defendant's failure to produce the surveillance video footage from KC's Korner on the night of the accident. The charge was as follows:

Now, in this case, a claim has been made that KC's permitted the destruction either negligently or intentionally of a recording depicting the service of alcoholic beverages to the Defendant Justin Barkaszi at KC's on December the 12th, 2006.

Under these circumstances, you may infer or determine that the missing evidence would not have been beneficial to the defendant, KC's Korner.

The trial judge also precluded Walter Kurilew from testifying during trial as to what he saw on the video and how that affected his decision not to preserve the footage.

KC's Korner argues that the jury charge was inappropriate because no duty to preserve the evidence ever arose and, thus, spoliation never occurred. *See Manorcare Health Servs. v. Osmose Wood Preserving, Inc.*, 336 *N.J.Super.* 218, 226, 764 *A.*2d 475 (App.Div.2001). KC's Korner claims that it had no reason to

know that plaintiff would bring suit against it before the video camera automatically taped over the footage from the night of the accident. Even though KC's Korner was aware that the accident occurred, plaintiff never put the bar on notice that he intended to file suit. KC's Korner proposed a jury charge which allowed the jury to make the duty determination for itself and permitted the adverse inference only if the jury found that "KC's negligently or intentionally permitted destruction of this evidence...." The trial judge refused to give this charge.

KC's Korner also contests the trial judge's decision to exclude Walter Kurilew from testifying as to why he did not take steps to preserve the footage. KC's Korner asserts that Walter viewed the relevant footage and observed the bartender serving Barkaszi a shot of Rumplemintz. Based on this, he concluded there were no grounds for a dram shop suit and therefore did not need to preserve the footage. KC's Korner argues that the trial judge's decision to prevent Walter from presenting this information to the jury resulted in a situation that was neither "just" nor "reasonable" under *Cockerline v. Menendez,* 411 *N.J.Super.* 596, 620–21, 988 *A.*2d 575 (App.Div.2010), *certif. denied,* 201 *N.J.* 499, 992 *A.*2d 793 (2010), because the judge allowed plaintiff's counsel to ask Walter whether he viewed the tape and whether he contacted the authorities to show them the footage.

Plaintiff counters that KC's Korner had a duty to preserve the surveillance footage because it should have recognized its importance, given that a patron was involved in the accident and the Kurilews had used surveillance footage in the past to resolve a legal dispute. Plaintiff points out that *Manorcare, supra,* establishes the proposition that spoliation can be committed negligently, rather than just intentionally, and that actual notice of pending litigation is not a prerequisite to issuing a negative inference charge. Therefore, according to plaintiff, the issuance of the adverse inference charge was "just and reasonable."

"Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby

interfering with the action's proper administration and disposition." *Cockerline, supra,* 411 *N.J.Super.* at 620, 988 *A.*2d 575 (quoting *Aetna Life & Cas. Co. v. Imet Mason Contractors,* 309 *N.J.Super.* 358, 364, 707 *A.*2d 180 (App.Div.1998)). The duty to preserve such evidence "is a question of law to be determined by the court," and "arises when there is pending or likely litigation between two parties, knowledge of this fact by the alleged spoliating party, evidence relevant to the litigation, and the foreseeability that the opposing party would be prejudiced by the destruction or disposal of this evidence." *Id.* at 620, 988 *A.*2d 575 (citing *Aetna, supra,* 309 *N.J.Super.* at 366, 707 *A.*2d 180). " 'The spoliator's level of intent, whether negligent or intentional, does not affect the spoliator's liability. Rather, it is a factor to be considered when determining the appropriate remedy for the spoliation.' " *Manorcare, supra,* 336 *N.J.Super.* at 226, 764 *A.*2d 475.

 "The spoliation inference permits the jury to infer that the evidence destroyed or concealed would not have been favorable to the spoliator.... The jury is free, however, to accept or reject the inference." *Cockerline, supra,* 411 *N.J.Super.* at 621, 988 *A.*2d 575 (internal quotations omitted). The jury should be given this instruction if plaintiff makes a "threshold showing" that defendant improperly caused the loss of the evidence. *Ibid.* (citing *Jerista v. Murray,* 185 *N.J.* 175, 203, 883 *A.*2d 350 (2005)).

 If the jury charge is incorrect, it "constitutes reversible error only if the jury could have come to a different result had it been correctly instructed." *Victor, supra,* 401 *N.J.Super.* at 617, 952 *A.*2d 493 (internal quotations omitted). A jury instruction is erroneous and likely to mislead the jury if the evidence presented at trial does not support the instruction. *See Dynasty, Inc. v. Princeton Ins. Co.,* 165 *N.J.* 1, 13–14, 754 *A.*2d 1137 (2000).

 The spoliation charge here was erroneous because plaintiff failed to make the "threshold showing" that KC's Korner improperly destroyed the surveillance footage. This error was particularly harmful because the judge did not allow the jury to

hear testimony concerning the reasons why KC's Korner chose not to preserve the footage. Rather, the jury was permitted to make the adverse inference regarding spoliation without hearing from Walter Kurilew that the surveillance footage supported the defense position that Barkaszi was not served alcohol after he was visibly intoxicated. We understand the judge's reluctance to allow KC's Korner to benefit from its failure to preserve the footage by offering unrebuttable testimony as to its content. Under these circumstances, however, the more prudent course would be not to charge spoliation and disallow any reference to the video surveillance.

This case is distinguishable from those on which plaintiff relies. In *Cockerline*, we held that the trial court's delivery of an adverse inference charge against the defendant UPS was proper because the company had committed spoliation. *Cockerline, supra,* 411 *N.J.Super.* at 621, 988 *A.*2d 575. UPS had a duty to preserve the "in-vehicle information system" (IVIS) data that reported the speed and brake application employed by the UPS truck at the time of an accident involving the plaintiff. *Id.* However, UPS allowed the data to be purged from the system after thirty days, which was the applicable protocol unless that truck had been involved in a serious accident. *Id.* at 610, 988 *A.*2d 575. The court stated the adverse inference was warranted for the following reasons: "plaintiff presented evidence that UPS allowed the IVIS data to be purged even though it usually looked at the data even in the case of a minor accident;" UPS had some concerns about liability even if the UPS truck had not directly injured the plaintiff; and because UPS was made aware of the plaintiff's claims while another third-party's claim arising from the same accident was still pending. *Id.* at 621, 988 *A.*2d 575.

KC's Korner, however, did not have a similar policy concerning data preservation. To the contrary, Walter testified that the surveillance system re-recorded every week. Furthermore, even though both Walter and Michael Kurilew learned of the accident

shortly after its occurrence, KC's Korner was not brought into the action as a party until over a year after the accident.

Reversed and remanded for a new trial.