# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0325-18T4

STATE OF NEW JERSEY IN
THE INTEREST OF B.J.,
a Juvenile.

_____

Submitted October 27, 2020 – Decided  January 29, 2021

Before Judges Gilson and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket Nos. FJ-13-0964-18, FJ-13-1044-18 and FJ-13-0906-18.

Joseph E. Krakora, Public Defender, attorney for appellant B.J. (Brian P. Keenan, Assistant Deputy Public Defender, of counsel and on the briefs).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent State of New Jersey (Monica do Outeiro, Assistant Prosecutor, of counsel, Liz F. Tores Sanchez, Legal Assistant, on the brief).

PER CURIAM

B.J. appeals from an adjudication of delinquency entered after a bench trial for conduct which, if committed by an adult, would constitute second-

degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). On appeal, he claims the trial court erred in denying his motion for judgment of acquittal and motion to suppress evidence, and in adjudicating him delinquent. Unpersuaded, we affirm.

B.J. first claims the trial court erred in relying on Sergeant Lorenzo Pettway's testimony that an object passed between B.J. and another juvenile, identified as R.J., was a gun. B.J. argues the testimony was inadmissible lay opinion because Pettway was "without personal knowledge," and his testimony was neither fact nor proper lay opinion testimony.

We "apply the same standards used by the trial court in its determination of [a] defendant's motion for a judgment of acquittal," State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011), and review the decision of the trial court de novo, see State v. Bunch, 180 N.J. 534, 548-49 (2004), in evaluating

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 459 (1967); see also R. 3:18-1.]

2

The State's favorable testimony included that of Pettway who, as supervisor of the Street Crimes Unit that investigated everything from shootings, homicides, gang activities and drug distribution, conducted a surveillance operation. From police headquarters, using cameras directed at a basketball court where there had been "increased complaints of gang activity" and reports of "shots fired" in the area, Pettway was able to see in real time B.J. give a gun to R.J.

The incident was also recorded and the video, which Pettway testified "memorialized what [he] saw," was played at trial. As segments of the video were played on direct examination, Pettway attempted to explain, in disjointed testimony amid interruptions by the court and all counsel, what was on the video. The cross-examination presents a clearer record of Pettway's description of the activities depicted in the video. With the video paused, Pettway was asked if he could "outline the gun." He replied:

> Yeah. Granted now the video stops so it's a little blurry but just prior, the couple of seconds prior, you can see, you can clearly see he's holding, see his fingers, it's gripping a gun, you can see the outline of a gun coming down and around here and then at some point during the video, you see he puts his finger outside the trigger guard, he grips it like this, pulls it out of his waist and you can see his finger go in this position.

A-0325-18T4

Notwithstanding the grainy video—which, according to Pettway, occurred any time the video was paused—he testified:

> [Y]ou could clearly see the black gun coming out of his waist and then when you stop the video it gets grainy again. So obviously if we're going strictly on this [paused] image, you're not going to see it but if you play it back a couple of seconds, you clearly see when the car headlights hit[] [B.J.], you see the black gun come out of his waist, you see him gripping it, which he's gripping now and then before he passes, his hand goes down, as if it's outside the trigger guard.

When the video was advanced and, again, paused, Pettway testified about that video segment:

> You can clearly see, see how his hand—if you see the way he's holding his hand, you see the black barrel of the gun here, you clearly see his hand going around, this is his thumb over the top and then you see the other fingers around the bottom of the gun.
>
> . . . .
>
> He's kind of holding it like this, yeah, so he's pulling it out of his waist, you clearly see when he initially pulled it out, the black gun, it was a large gun, you clearly see the black gun coming out of his waist and now you see him here holding the gun, when you see the barrel coming here.

Defense counsel, in an attempt to establish that the article was held like a cell phone, acknowledged that Pettway saw a gun on the video, but asked if he

A-0325-18T4

agreed "that maybe [to] the untrained eye[,] [others] could not see a gun in this video?" Pettway responded:

> It'd be hard not to see it—I think any person seeing what the young man did [would] know clearly it wasn't a cell phone coming out of his waist and you clearly see that he pulled out a gun, he held a gun and . . . he passed it off to [R.J.] who—if it was a cell phone, he's not going to look around and stick it underneath his thigh, which is what he did[.]

That evidence established that Pettway personally observed B.J. possess a gun on the basketball court. It is undisputed that B.J. was a juvenile and was not of age to obtain a firearms purchaser identification card or a permit to purchase that gun, see N.J.S.A. 2C:58-3(c)(4), or a permit to possess or carry same, see N.J.S.A. 2C:58-6.1(b). As B.J. stated in his merits brief: "The evidence against [him] consisted of the gun, the video[] and the fact that he was arrested at the basketball court." The gun introduced into evidence was recovered from R.J. after he and B.J. were arrested on the basketball court by members of Pettway's unit to whom he relayed his observations. Under the Reyes standard, the evidence established the elements of possession of a handgun "without first having obtained a permit to carry the same." N.J.S.A. 2C:39-5(b). As such, the trial court did not err by denying B.J.'s motion for judgment of acquittal.

The same evidence established that Pettway had probable cause to arrest B.J. We therefore reject B.J.'s argument that the trial court erred by denying his motion to suppress evidence. B.J. contends the officer who approached R.J. did not first perform a pat-down search before arresting R.J. and subsequently discovering the gun in his waistband where Pettway said R.J. placed it after he had concealed it underneath his thigh. Even accepting that argument, the officer was justified in arresting R.J., who was properly searched incident thereto. See Chimel v. California, 395 U.S. 752, 762-63 (1969); see also State v. Gibson, 218 N.J. 277, 299 (2014).

Pettway's direct observation of B.J.'s possession of a gun provided "a well-grounded suspicion that a crime ha[d] been or [was] being committed." State v. Nishina, 175 N.J. 502, 515 (2003) (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)). Thus, probable cause existed for the arrest and subsequent search of R.J. after Pettway saw B.J. pass the gun to him. See State v. Smith, 155 N.J. 83, 92 (1998) (recognizing the same standards apply for determining probable cause to arrest and probable cause to search).

B.J. claims the trial court abdicated its responsibility and relied on Pettway's lay opinion that the object B.J. possessed and transferred was a gun

chiefly because the trial court could not definitively see that the object shown in the video was a gun. We disagree with that skewed interpretation of the record.

The trial court admitted during its oral suppression-motion decision it "could not tell [by] looking at it in the video[] that it was a gun." But the court did not think its inability to see the gun, on what was obviously a blurry video, was crucial. Instead, it deemed important that, "based on [Pettway's] experience, based on his training, based on what he [saw], based on [his] actions . . . when he stepped down" from the witness stand and demonstrated B.J.'s handling of the object, Pettway maintained "repeatedly [on] both direct and cross-examination, . . . that in his training, in his experience, that that, in fact, was a gun."

When the assistant prosecutor asked[1] Pettway how he knew what B.J. handed to R.J. was a gun, Pettway began: "Just the way he . . . was standing there, also when he pulled the gun." In a haphazard exchange, the testimony was interrupted by a defense objection that briefly referenced "foundation," which was, in turn, interrupted by the trial court's ruling that referred to Pettway's training and experience in concluding it had "to allow the State to . . .

---

[1] The trial court decided a separate hearing on the motion to suppress was unnecessary and utilized the trial testimony to decide that motion.

A-0325-18T4

get testimony from [him] why in his professional opinion he believe[d] that it was a weapon that was being transferred[.]"

The assistant prosecutor then asked: "So based on what you saw, what led you to believe that this was in fact a gun that was being transferred?" Pettway replied:

> The way he was acting it was very suspicious, the way he pulled the gun out of his waist area, his common area, they normally carry a handgun.
>
> . . . .
>
> When [B.J.]—when he pulls out of his waistband area, the way he's holding the gun with his finger outside the trigger guard, he's holding the gun downward and then passes it off to his—his friend, [R.J.].

Further questioning elicited that Pettway had seen guns being transferred in that manner in his time as a police officer.

The trial court could have relied on that testimony in deciding the suppression motion. One of the factors that can be considered in determining if probable cause was established is a police officer's "common and specialized experience." Schneider v. Simonini, 163 N.J. 336, 362 (2000); see also State v. McLean, 205 N.J. 438, 462 (2011) (noting officer testimony for establishing probable cause need not be admissible at trial under N.J.R.E. 701); State v.

<u>Moore</u>, 181 N.J. 40, 46 (2004) (finding officer's observation of drug transaction, in light of his experience, established probable cause for arrest).

It is important to note the trial court did not simply rely on that portion of Pettway's testimony where he reviewed what was depicted in the video. The trial court asked Pettway: "Looking at the . . . whitish . . . object" shown in the video, "not [B.J.'s] mannerisms, not what he did with it, not how he was standing, all of that, were you able to look at it and in your own professional opinion as an officer with all this training, did you believe it was a gun?" Pettway answered affirmatively. Although the trial court referenced Pettway's training and experience, it is clear that, absent any reference to his observations of how the object was handled, Pettway's answer had to be based only on his observation of the gun, not on any deduction he made from the handling of the gun.

The trial court clarified in its suppression decision that any such deduction did not form the sole basis for its decision that probable cause was established. The court specified Pettway "even said that he could see the gun." The court also made clear it was basing its suppression decision on evidence that included the testimony and video.

The trial court's findings were supported by sufficient credible evidence in the record and are entitled to our deference. State v. Elders, 192 N.J. 224, 243 (2007). The trial court did not err by crediting Pettway's first-hand observations of B.J. and R.J., and his observation of what he "clearly" saw as a gun. Other testimony establishing the handling of the object, consistent with Pettway's prior observations during his tenure as an officer of the handling of a gun, was also properly considered as establishing probable cause.

The same record facts inform our decision to reject B.J.'s argument that his adjudication must be reversed. In rendering its final decision, the trial court again conceded that it could not tell from the video that the object B.J. possessed was a gun. The court, however, likened its role to a juror who could not discern a gun from the video evidence, but could determine whether the State met its burden by crediting the police witness. The court reasoned it had

> a police officer who [testified] that he saw it and it was a gun and even under cross-examination that he knew it was a gun, not only because of the size of it, the color of it, the way that [B.J.] held it, what [R.J.] did with it after he got it, putting it under his thigh, how he left it there for a fairly substantial period of time, how he finally then put it . . . from under his thigh into his pants.

The court continued, even without the video, a fact-finder could determine, based on Pettway's testimony about his observations through the video camera,

which the court likened to binoculars, that the evidence established that B.J. possessed the gun. That the gun was ultimately found on R.J., to whom B.J. was seen passing it, strongly supported the trial court's determination as to B.J. See State v. Carroll, 256 N.J. Super. 575, 603 (App. Div. 1992) (recognizing circumstantial evidence alone could support a judge or jury's verdict of guilt).

Our standard of review in juvenile delinquency bench trials "is narrow and is limited to evaluation of whether the trial [court's] findings are supported by substantial, credible evidence in the record as a whole." State in the Int. of J.P.F., 368 N.J. Super. 24, 31 (App. Div. 2004). We do not engage in an independent assessment of the evidence as if "[we] were the court of first instance." State v. Johnson, 42 N.J. 146, 161 (1964). While we need not defer to the trial court's interpretation of the law, State v. Brown, 118 N.J. 595, 604 (1990), we do defer to its findings, particularly those that are substantially influenced by the opportunity to observe the witnesses directly, Johnson, 42 N.J. at 161.

Under those standards, we see no reason to disturb the trial court's conclusion. Although the court couched some of Pettway's testimony in terms sometimes used to describe lay opinion, the sergeant merely described what he saw and explained the reasons he determined what he saw was a gun. He never

said his determination was based on training or experience, except that he had seen guns handled in a similar manner on past occasions. And he never opined on B.J.'s guilt.

And, even if the testimony were lay opinion, it was based on Pettway's personal observations during his surveillance, see McLean, 205 N.J. at 456-57; see also N.J.R.E. 701(a), and, as was obvious from the trial court's questions and decisions, explained Pettway's testimony and "shed[] light on the determination of a disputed factual issue," see McLean, 205 N.J. at 458; see also N.J.R.E. 701(b), that is, whether the object B.J. possessed was a gun. It was thus admissible lay opinion.

We review a trial court's admission of evidence for abuse of discretion, Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008), and disregard any error we deem harmless, Higgins v. Owens-Corning Fiberglas Corp., 282 N.J. Super. 600, 609 (App. Div. 1995). Only those errors "clearly capable of producing an unjust result" would warrant a reversal of judgment. See R. 2:10-2. Such is not the case here.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0325-18T4